BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
Andrew S. Friedman (seeking pro hac vice)
Wendy J. Harrison (CA SBN 151090)
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
(602) 274-1100

ORIGINAL
FILED

AUG 2 1 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CHAVEZ & GERTLER, L.L.P.
Mark A. Chavez (CA SBN 90858)
42 Miller Avenue
Mill Valley, California 94941
(415) 381-5599

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

GILBERT VENTURA, SR., and
TRACY D. VENTURA,

Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

Defendant.

No. C07 4309 EMC

CLASS ACTION

CLASS ACTION COMPLAINT FOR:

1. Violations of the Equal Credit
   Opportunity Act; 15 U.S.C. § 1691

2. Violations of the Fair Housing Act;
   42 U.S.C. § 3601

3. Violations of the Civil Rights Act, 42
   U.S.C. §1981; and

4. Violations of the Civil Rights Act, 42
   U.S.C. §1982.

**DEMAND FOR JURY TRIAL**

1.      Plaintiffs Gilbert Ventura, Sr., and Tracy D. Ventura ("Plaintiffs"), by
and through their attorneys, bring this action against Wells Fargo Bank, N.A. (referred
to herein as "Wells Fargo" or "Defendant") seeking redress for racially discriminatory
lending practices under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq.
("ECOA"), the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA"), and the Civil

- 1 -

Received Time Aug 21  4:18PM

1   Rights Act, 42 U.S.C. §§ 1981 and 1982, on behalf of themselves and all others

2   similarly situated.

## INTRODUCTION

3       2.    This class action challenges Defendant Wells Fargo's racially

4   discriminatory mortgage lending practices. Defendant Wells Fargo has engaged in

5   both intentional and disparate impact discrimination through its development and

6   implementation of mortgage pricing policies and procedures that provide financial

7   incentives to its authorized loan officers, mortgage brokers and correspondent lenders

8   to make subjective decisions to increase interest rates and charge additional fees and

9   costs to minority borrowers.

10      3.    Defendant Wells Fargo's authorized loan officers, mortgage brokers and

11  correspondent lenders are given discretion – and are actually encouraged and

12  incentivized – to increase interest rates and charge additional fees to certain

13  borrowers. These policies directly lead to minorities receiving home loans with

14  higher interest rates and higher fees and costs than similarly situated non-minority

15  borrowers.

16      4.    As used in this Complaint, "minority" or "minorities" shall refer to all

17  non-Caucasians and other minority racial groups protected under 42 U.S.C. §§ 1981,

18  1982, and 3604, and 15 U.S.C. § 1691.

19      5.    Plaintiffs bring this action on behalf of all minorities (hereinafter

20  collectively referred to as the "Class" or "members of the Class") who have entered

21  into residential mortgage loan contracts that were financed or purchased by Defendant

22  Wells Fargo, and who have been subjected to racial discrimination.

23      6.    Plaintiffs seek injunctive, declaratory, and equitable relief and other

24  remedies for Defendant Wells Fargo's racially discriminatory conduct.

## JURISDICTION AND VENUE

25      7.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives

26  this Court original jurisdiction over civil actions arising under federal law.

- 2 -

8.    Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) because a substantial part of the events giving rise to Plaintiffs' and the Class's claims occurred in this District. Defendant's corporate headquarters are located in this District, and the practices complained of herein were formulated and structured in this District.

## PARTIES

9.    Plaintiffs Gilbert Ventura, Sr., and Tracy D. Ventura are Latino homeowners who reside at 1136 East Avenida Isabella, Casa Grande, AZ 85222.

10.    Defendant Wells Fargo is a mortgage lender whose principal place of business is at 464 California St., San Francisco, CA 94104.

## FACTS

## I.    HISTORICAL DISCRIMINATION IN AMERICAN MORTGAGE LENDING

11.    Racial discrimination in America's mortgage lending industry has a long legacy. As this Complaint attests, that unfortunate history continues to this day due to discriminatory treatment of minority borrowers by mortgage banks such as Defendant Wells Fargo.

12.    The Joint Center for Housing Studies at Harvard University conducted a study in 2005 called "The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending," which summarizes that history well. It states that "[i]n the immediate post-World War II period, racial discrimination in mortgage lending was easy to spot. From government-sponsored racial covenants in the Federal Housing Administration (FHA) guidelines to the redlining practices of private mortgage lenders and financial institutions, minorities were denied access to home mortgages in ways that severely limited their ability to purchase a home. Today, mortgage lending discrimination is more subtle. . . . [M]ore than three decades after the enactment of national fair lending legislation, minority consumers continue to have less-than-equal access to loans at the best prices and on the best terms that their credit history, income, and other individual financial considerations merit."

- 3 -

13. The federal Home Mortgage Disclosure Act ("HMDA") requires mortgage lenders to report information about the home loans they process each year. In 2005, lenders reported information on more than 30 million home loan applications pursuant to HMDA. In 1989, Congress required lenders to begin disclosing information about mortgage borrowers' race and ethnicity. In 2004, concerned with potential racial discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, the Federal Reserve Board began requiring lenders to also report information concerning rates, points, and fees, charged to borrowers on high-cost loans.

14. HMDA data for 2004 reveals profound loan pricing disparities between Hispanic borrowers and non-Hispanic whites even after controlling for borrowers' gender, income, property location, and loan amount. After accounting for those differences in the 2004 HMDA data, Hispanic borrowers were still almost twice as likely to receive a higher-rate home loan as non-Hispanic whites. (http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf (last viewed August 14, 2007).) In a speech last year, the Vice-Chairman of the Federal Deposit Insurance Corporation, Martin Gruenberg, discussed the 2004 HMDA data and observed that that data "clearly indicated" that Hispanics are more likely to receive high-cost home loans than are non-Hispanic whites. (http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html (last viewed August 15, 2007).)

15. Likewise, HMDA data for 2005 shows that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points." Id. at A159. The situation is similar for refinancings, where there is a difference of 28.3 percentage points between blacks and non-Hispanic whites. Avery, Brevoort, and Canner, Federal Reserve Bulletin, A124, A159.

- 4 -

1      16.   The Association of Community Organizations for Reform Now
2  (ACORN) released a report entitled "The High Cost of Credit: Disparities in High-
3  priced Refinanced Loans to Minority Homeowners in 125 American Cities," dated
4  September 27, 2005, which found that "[i]n every metropolitan area where at least 50
5  refinances were made to African-American homeowners, African-Americans were
6  more likely to receive a high-cost loan than White homeowners."

7      17.   Defendant Wells Fargo's lending practices are of a piece with the
8  foregoing history.

9  **II.   PAST AS PROLOGUE: DEFENDANT WELLS FARGO'S**
10         **DISCRIMINATORY LENDING POLICIES**

11     **A.   DEFENDANT WELLS FARGO'S RELATIONSHIPS WITH ITS**
12           **LOAN    OFFICERS,    MORTGAGE    BROKERS    AND**
13           **CORRESPONDENT LENDERS**

14     18.   Defendant Wells Fargo originates and funds mortgage loans through loan
15  officers, brokers and through a network of correspondent lenders.  Loan officers,
16  mortgage brokers and correspondent lenders that work with Defendant Wells Fargo
17  broker and fund loans in collaboration with Defendant Wells Fargo and in
18  conformance with Defendant Wells Fargo's credit-pricing policies and procedures.
19  As Defendant Wells Fargo's website explains, mortgage brokers "match borrowers
20  with lenders."    (https://www.wellsfargo.com/mortgage/glossary/m (last viewed
21  August 14, 2007).) Defendant Wells Fargo's website states that correspondent lenders
22  "originate, underwrite, and close loans before sending them to Wells Fargo[.]"
23  (https://www.wellsfargo.com/com/third_party_mortgage/) (last viewed August 14,
24  2007).)

25     19.   Defendant Wells Fargo has followed – and continues to follow –
26  discretionary loan pricing procedures that cause minority borrowers to pay subjective
27  fees such as yield spread premiums and other mortgage-related finance charges at
28  higher rates than similarly situated non-minority borrowers. Defendant Wells Fargo

1  has intentionally discriminated against Plaintiff and Class Members through these

2  policies and procedures – systematically giving them mortgage loans with less

3  favorable conditions than were given to similarly situated non-minority borrowers.

4  This pattern of discrimination is not the result of random or non-discriminatory

5  factors. Rather, it is a direct result of Defendant Wells Fargo's mortgage lending

6  policies and procedures.

7      20.    Defendant Wells Fargo's authorized loan officers, mortgage brokers and

8  correspondent lenders receive part or all of their compensation from Defendant Wells

9  Fargo based on the interest rate charged to the borrower. Defendant Wells Fargo's

10  loan officers, authorized brokers and correspondent lenders receive more

11  compensation from Defendant Wells Fargo when they steer their clients into Wells

12  Fargo loans with higher interest rates, and less compensation when they place their

13  clients into Wells Fargo loans with lower interest rates.

14      21.    Defendant Wells Fargo intentionally and actively implements this

15  discriminatory credit-pricing policy in a number of ways.

16      22.    Defendant Wells Fargo actively educates its loan officers and brokers in

17  Defendant Wells Fargo's credit policies and procedures. Defendant Wells Fargo

18  conducts weekly training "webinars" (i.e., interactive Internet seminars) for its brokers

19  concerning its loan products where it disseminates to brokers "detailed information on

20  [Defendant        Wells        Fargo's]        product        guidelines[.]"

21  (https://ilnet.wellsfargo.com/ildocs/ee/training.html (last viewed on August 15,

22  2007).) Defendant Wells Fargo also maintains an Internet site called "Broker's First"

23  that supplies brokers with rate sheets, a "Broker Guide," and underwriting guidelines.

24      23.    Defendant Wells Fargo also actively directs its loan officers and brokers

25  in marketing Defendant Wells Fargo's loans. Defendant Wells Fargo provides its

26  authorized        brokers        downloadable        mortgage        advertisements.

27  (https://ilnet.wellsfargo.com/ildocs/ee/marketing_tools.html (last viewed on August 7,

28  2007).)

1    24.    These credit-pricing policies and procedures permit Defendant Wells

2  Fargo's authorized loan officers, mortgage brokers and correspondent lenders

3  subjectively to charge certain loan applicants yield spread premiums and other

4  discretionary charges, including minority loan applicants.

5    25.    This pattern of discrimination cannot be justified by business necessity,

6  and could be avoided through the use of alternative policies and procedures that have

7  less discriminatory impact and no less business efficacy.

8

9  **B.    DEFENDANT WELLS FARGO'S DISCRETIONARY CREDIT PRICING SYSTEM: DESIGNED TO DISCRIMINATE**

10

11    26.    Defendant Wells Fargo discriminates through its authorized mortgage

12  brokers.  Authorized mortgage brokers act as Defendant Wells Fargo's agents in

13  originating mortgage loans.  Authorized mortgage brokers enter into agreements with

14  Defendant Wells Fargo to accept loan applications on behalf of Defendant Wells

15  Fargo; communicate to loan applicants financing terms and rates set by Defendant

16  Wells Fargo; tell loan applicants about Defendant Wells Fargo's various financing

17  options; and ultimately originate mortgage loans funded by Defendant Wells Fargo

18  using Defendant Wells Fargo's forms and in accordance with Defendant Wells

19  Fargo's policies and procedures.

20    27.    Likewise with Defendant Wells Fargo's authorized correspondent lenders

21  and loan officers, who also act as Defendant Wells Fargo's agents in originating loans.

22  Correspondent mortgage lenders and loan officers that work with Defendant Wells

23  Fargo make loans in accordance with Defendant Wells Fargo's credit policies and

24  procedures.  Defendant Wells Fargo funds correspondent-generated loans before or

25  shortly after they go to closing.

26    28.    Defendant Wells Fargo, then, funds loans originated by its loan officers,

27  authorized mortgage brokers and correspondent lenders, sets the terms and conditions

28  of credit on those loans, and shoulders part or all of the risk on such loans. Defendant

1 Wells Fargo actively and intentionally enforces its credit policies through its
2 authorized loan officers, mortgage brokers and correspondent lenders in a variety of
3 ways. Among other things, Defendant Wells Fargo supplies its loan officers,
4 correspondent lenders and mortgage brokers with an array of loan-related forms and
5 agreements, including loan contracts, loan applications, and instructions on
6 completing loan applications and contracts. And, as noted above, Wells Fargo
7 actively trains its authorized brokers to follow Wells Fargo's policies and procedures,
8 and reinforces that training with marketing support.

9    29.    Once a loan applicant has provided credit information to Defendant
10 Wells Fargo through a loan officer, mortgage broker or correspondent lender,
11 Defendant Wells Fargo performs an initial objective credit analysis. At this point,
12 Defendant Wells Fargo evaluates numerous risk-related credit variables, including
13 debt-to-income ratios, loan-to-value ratios, credit bureau histories, debt ratios,
14 bankruptcies, automobile repossessions, prior foreclosures, payment histories, credit
15 scores, and the like.

16    30.    Defendant Wells Fargo derives a risk-based financing rate from these
17 objective factors, which Defendant Wells Fargo and others in the mortgage industry
18 simply call the "par rate." (Defendant Wells Fargo's brokers and correspondent
19 lenders can also estimate the par rates by referring to an applicant's credit bureau-
20 determined credit score.)

21    31.    Although Defendant Wells Fargo's initial analysis applies objective
22 criteria to calculate this risk-related interest rate, Defendant Wells Fargo as a matter of
23 policy and procedure authorizes its loan officers, brokers and correspondent lenders to
24 mark up that rate later, and also impose additional non-risk-based charges including
25 yield spread premiums, and other discretionary fees. Defendant Wells Fargo regularly
26 communicates applicable par rates, authorized yield spread premiums, and other
27 discretionary fees to its loan officers, brokers and correspondent lenders via "rate
28 sheets" and other communications.

32.    Defendant Wells Fargo gives its loan officers, authorized mortgage brokers and correspondent lenders discretion to impose yield spread premiums and other subjective fees on borrowers. When borrowers pay yield spread premiums, Defendant Wells Fargo shares in additional income generated by the premium because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their Wells Fargo loan than they would be if they had been placed in a par rate loan without a yield spread premium.

33.    Defendant Wells Fargo's borrowers pay yield spread premiums and other discretionary fees that inflate their finance charges not knowing that a portion of their finance charges are non-risk-related.

34.    Defendant Wells Fargo's policies and procedures concerning the assessment of yield spread premiums and other discretionary fees cause persons with identical or similar credit scores to pay differing amounts for obtaining credit. Such subjective loan pricing - which by design imposes differing finance charges on persons with the same or similar credit profiles - disparately impacts Defendant Wells Fargo's minority borrowers.

35.    While Defendant Wells Fargo's use of a common credit policy for all loan applicants might appear to be racially neutral, Defendant Wells Fargo's use of yield spread premiums and other discretionary fees disproportionately and adversely affects minorities (relative to similarly situated non-minorities). Defendant Wells Fargo's credit policy causes minorities to pay disparately more discretionary finance charges than similarly situated non-minorities. As the HMDA data cited herein indicates, minorities are substantially more likely than similarly situated non-minorities to pay such charges.

36.    Defendant Wells Fargo's credit policy is in fact intentionally discriminatory. As described above, Defendant Wells Fargo's credit pricing policy by design discriminates against minority borrowers.

## III.  DEFENDANT WELLS FARGO IMPOSED DISCRIMINATORY FEES ON PLAINTIFF

37.  Defendant Wells Fargo's discriminatory credit pricing policy directly damaged Plaintiffs. On or about September 27, 2005, Plaintiffs refinanced their home with a mortgage loan issued by Defendant Wells Fargo in the amount of $175,500. Phoenix Home Loans ("PHL"), was the mortgage broker on Plaintiffs' home refinancing.

38.  According to their HUD-I closing statement (attached hereto as Exhibit 1), Plaintiffs at closing were subjected to a charge described as "Mtg Broker Comp by WFB to Phoenix Home Loans" in the amount of $2,632.50 on a "POC" basis (i.e., paid outside of closing) by Defendant Wells Fargo. On information and belief, this fee was in fact a yield spread premium. This yield spread premium was assessed pursuant to Defendant Wells Fargo's credit pricing policy.

39.  PHL and Defendant Wells Fargo knew that Plaintiffs were minority borrowers. The PHL employee who brokered Plaintiffs' Wells Fargo loan in conformance with Defendant Wells Fargo's discriminatory credit pricing policy was aware that Plaintiffs are Hispanics when brokering Plaintiffs' loan.

40.  As a result of Defendant Wells Fargo's discriminatory conduct, Plaintiffs received a loan on worse terms with higher costs than similarly situated non-minority borrowers.

### CLASS ACTION ALLEGATIONS

41.  Plaintiffs repeat and re-allege each allegation above as if set forth herein in full.

42.  This class action is brought pursuant to ECOA, the FHA and the Civil Rights Act by Plaintiffs on behalf of themselves and all minority borrowers (the "Class") who entered into residential mortgage loan contracts that were financed or purchased by Defendant Wells Fargo, and who were harmed by Defendant's discriminatory conduct.

43.   Plaintiffs sue on their own behalf, and on behalf of a class of persons under Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure.

44.   Plaintiffs do not know the exact size of the Class or identities of the members of the Class, since that information is in the exclusive control of Defendant Wells Fargo. Plaintiffs believe that the Class includes many thousands, or tens of thousands of individuals, who are geographically dispersed throughout the United States. Therefore, the Class is so numerous that joinder of all members is impracticable.

45.   All members of the Class have been subjected to and affected by Defendant Wells Fargo's practice of assessing yield spread premiums and other discretionary fees on mortgage loans. There are questions of law and fact that are common to the Class, and that predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

    a.   the nature and scope of Defendant Wells Fargo's policies and procedures concerning the assessment of yield spread premiums and other discretionary fees on mortgage loans it funds;

    b.   whether Defendant Wells Fargo discriminated against Class Members by charging them higher interest, fees, and costs, than Defendant Wells Fargo charges similarly situated non-minority borrowers;

    c.   whether Defendant Wells Fargo's intent in its discriminatory policies and procedures was racially motivated;

    d.   whether Defendant Wells Fargo can articulate any legitimate non-discriminatory reason for its policies and procedures;

    e.   whether Defendant Wells Fargo and its subsidiaries are creditors under the ECOA because, in the ordinary course of

- 11 -

business, they participate in the decision of whether or not to extend credit to consumers;

f.    whether Defendant Wells Fargo's policies and procedures regarding yield spread premiums and other discretionary fees have a disparate impact on minority borrowers;

g.    whether Defendant Wells Fargo has any business justification for its policies and procedures.

h.    whether there is a less discriminatory alternative to these policies and procedures;

i.    whether Defendant Wells Fargo devised and deployed a scheme or common course of conduct that acted to deceive Plaintiff and members of the Class;

j.    whether the Court can enter declaratory and injunctive relief; and

k.    the proper measure of disgorgement or monetary relief.

46.    Plaintiffs' claims are typical of the claims of the Class, and do not conflict with the interests of any other members of the Class in that both Plaintiffs, and the other members of the Class, were subjected to the same yield spread premiums and other discretionary fees that have disproportionately affected minority borrowers.

47.    Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs are committed to vigorous prosecution of the Class's claims, and have retained attorneys who have extensive experience in consumer protection and credit discrimination actions.

48.    Defendant Wells Fargo has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

49.   A class action is superior to other methods for the speedy and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

**ACCRUAL, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION, AND EQUITABLE TOLLING**

50.   Plaintiffs and Class Members did not know, and could not reasonably have known, that they would receive from Defendant Wells Fargo mortgage loans with worse terms and higher costs than non-minorities. Their claims did not accrue until shortly before the filing of this action.

51.   Defendant Wells Fargo's discriminatory conduct was inherently self-concealing. Defendant Wells Fargo knew that Plaintiffs and Class Members could not determine the relationship between the terms, fees, and costs of their loans to those available to non-minorities. Defendant Wells Fargo knew that the terms, fees, and costs provided to minorities, unbeknownst to them, were substantially worse than the loans provided to non-minorities.

52.   Defendant Wells Fargo has not released or provided information about its discrimination against Plaintiffs and Class Members, and has actively and fraudulently concealed its discriminatory practices.

53.   As a result of the foregoing, Plaintiffs and Class Members in the exercise of due diligence could not have reasonably discovered the discriminatory practices, and did not do so until just recently. For the reasons alleged above, the members of the Class still do not know that they have been and continue to be injured by Defendant Wells Fargo's discriminatory conduct.

54.   Defendant Wells Fargo's discriminatory conduct is continuing in nature, and Defendant Wells Fargo has committed discriminatory acts throughout the limitations period.

55.   There is a substantial nexus between the acts of discrimination occurring within the limitation periods prior to filing suit, and the acts of discrimination before

- 13 -

1  that time. The acts involve the same type of discrimination and are recurring, not

2  isolated events.

3      56.    Defendant Wells Fargo specifically misled Plaintiffs and Class Members

4  into believing that the mortgage-related terms, fees, and costs they were offered were

5  fair, reasonable, and the same as offered to non-minorities, and took steps to conceal

6  its fraudulent and unfair conduct.

7      57.    The statute of limitations applicable to any claims that Plaintiffs or other

8  Class Members have brought or could bring as a result of the unlawful and fraudulent

9  concealment and course of conduct described herein, have been tolled as a result of

10  Defendant Wells Fargo's fraudulent concealment. In addition, Plaintiffs and the Class

11  did not and could not have discovered their causes of action until the time alleged

12  below, thereby tolling any applicable statute of limitations.

13                          **COUNT I**

14          **RACIAL DISCRIMINATION (42 U.S.C. § 1981)**

15      58.    Plaintiffs repeat, re-allege, and incorporate the allegations contained in

16  paragraphs 1 through 57 above as if fully set forth herein.

17      59.    Defendant Wells Fargo intentionally discriminated against Plaintiffs and

18  Class Members by charging higher interest rates and other fees and costs than were

19  charged to similarly situated non-minority borrowers.

20      60.    Defendant Wells Fargo unlawfully discriminated against Plaintiffs and

21  Class Members in (i) formation of contracts, (ii) making, performance, modification,

22  and termination of contracts, (iii) the enjoyment of all benefits, privileges, terms and

23  conditions of the contractual relationship, and/or (iv) conduct that interferes with the

24  right to establish and enforce contract obligations.

25      61.    Defendant Wells Fargo's actions violate 42 U.S.C. § 1981, as well as the

26  rights of Plaintiffs and the Class under the Fifth, Thirteenth, and Fourteenth

27  Amendments to the Constitution of the United States.

28

- 14 -

62.   Plaintiffs and Class Members are entitled to injunctive and declaratory relief and damages, or make whole equitable relief as a result of Defendant Wells Fargo's discriminatory conduct.

63.   At no time has Defendant Wells Fargo undertaken corrective action to ameliorate its racially discriminatory practices. Defendant Wells Fargo continues to reap the profits of its discriminatory practices and continues to discriminate. Defendant Wells Fargo's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. Defendant Wells Fargo has acted with malice and reckless indifference to the federally protected rights of Plaintiffs and members of the Class. As a result, Plaintiffs and members of the Class are entitled to punitive damages.

## COUNT II
### RACIAL DISCRIMINATION (42 U.S.C. § 1982)

64.   Plaintiffs repeat, re-allege, and incorporate the allegations contained in paragraphs 1 through 63 above as if fully set forth herein.

65.   Section 42 U.S.C. §1982 provides that all citizens of the United States "shall have the same right, in every State and Territory, as is enjoyed by White citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

66.   Defendant Wells Fargo has discriminated against Plaintiffs and the Class with respect to their home mortgage loans by charging Plaintiffs and the Class higher interest rates and other discretionary fees than Defendant Wells Fargo has charged similarly situated non-minority consumers. As a result of Defendant Wells Fargo's conduct, Plaintiffs and the Class have not had the same right as Caucasians to inherit, purchase, sell, hold, and convey real property. Defendant Wells Fargo has thereby violated 42 U.S.C. § 1982.

67.   Defendant Wells Fargo's violation of 42 U.S.C. § 1982 was intentional and malicious.

1    68.    As a proximate result of Defendant Wells Fargo's violation of 42 U.S.C.

2  § 1982, Plaintiffs and members of the Class have been injured, and are entitled to

3  injunctive and declaratory relief and damages, or make whole equitable relief.  In

4  addition, Defendant Wells Fargo's conduct as alleged herein was intentional, willful,

5  wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere

6  negligence. Defendant Wells Fargo acted with malice and reckless indifference to the

7  federally protected rights of Plaintiffs and members of the Class.  As a result,

8  Plaintiffs and members of the Class are entitled to punitive damages.

9  <strong>COUNT III</strong>

10  <strong>VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. §§ 3601 – 3619)</strong>

11    69.    Plaintiffs repeat, re-allege and incorporate the allegations in paragraphs 1

12  through 68 above as if fully set forth herein.

13    70.    Mortgage lending and the providing of residential mortgage loans is a

14  "residential real estate-related transaction" within the meaning of the FHA. 42 U.S.C.

15  § 3605(b).

16    71.    By imposing higher interest rates and other discretionary fees on

17  residential mortgage loans to Plaintiffs and Class Members than it imposed on non-

18  minority mortgage borrowers, Defendant Wells Fargo has discriminated against

19  Plaintiffs and members of the Class concerning their ability to participate in real

20  estate-related transactions, and in the terms and conditions of such transactions, in

21  violation of the FHA. 42 U.S.C. § 3605(a).

22    72.    In addition, Defendant Wells Fargo's pricing policies and procedures

23  (including yield spread premiums), which provide financial incentives to its mortgage

24  brokers and correspondent lenders to make subjective decisions to increase interest

25  rates and charge additional fees and costs, had a disparate impact upon Plaintiffs and

26  Class Members.

27

28

- 16 -

73.    As a proximate result of Defendant Wells Fargo's violation of 42 U.S.C. § 3605, Plaintiffs and members of the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

74.    In addition, Defendant Wells Fargo's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. Defendant Wells Fargo acted with malice and reckless indifference to the federally protected rights of Plaintiffs and members of the Class. As a result, Plaintiffs and members of the Class are entitled to punitive damages.

75.    Moreover, Defendant Wells Fargo continues to discriminate in violation of the FHA against members of the Class every time Defendant Wells Fargo provides a home mortgage loan as described herein. If not enjoined from such violation by the Court, Defendant Wells Fargo will continue to engage in conduct that disregards the rights of Plaintiffs and members of the Class, and cause Plaintiffs and members of the Class irreparable injury for which there is no adequate remedy at law. 42 U.S.C. § 3613(c).

76.    Plaintiffs and members of the Class ask this Court to declare the rights of the parties herein regarding Defendant Wells Fargo's obligation to participate in credit transactions without discriminating against applicants for credit on the basis of the applicants' race.

## COUNT IV
## VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
## (15 U.S.C. §§ 1691 - 1691f)

77.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1 through 76 above as if fully set forth herein.

78.    Defendant Wells Fargo engages in credit transactions through its offering, granting, and purchasing of residential mortgage loans.

1     79.   By imposing higher interest rates and other discretionary fees on

2   residential mortgage loans to Plaintiffs and Class Members than it imposed on non-

3   minority mortgage borrowers, Defendant Wells Fargo has discriminated against

4   Plaintiffs and members of the Class with respect to a credit transaction on the basis of

5   race in violation of the ECOA. 15 U.S.C. § 1691(a).

6     80.   In addition, Defendant Wells Fargo's pricing policies and procedures

7   (including yield spread premiums), which provide financial incentives to its mortgage

8   brokers and correspondent lenders to make subjective decisions to increase interest

9   rates and charge additional fees and costs, have a disparate impact on Plaintiffs and

10   Class Members.

11     81.   As a proximate result of Defendant Wells Fargo's violation of 15 U.S.C.

12   § 1691, Plaintiffs and members of the Class have been injured and are entitled to

13   injunctive and declaratory relief and damages, or make whole equitable relief.

14     82.   In addition, Defendant Wells Fargo's conduct as alleged herein was

15   intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated

16   beyond mere negligence. Defendant Wells Fargo acted with malice and reckless

17   indifference to the federally protected rights of Plaintiffs and members of the Class.

18   As a result, Plaintiffs and members of the Class are entitled to punitive damages.

19     83.   Moreover, Defendant Wells Fargo continues to discriminate in violation

20   of the ECOA against Class Members every time Defendant Wells Fargo provides a

21   home mortgage loan as described herein. If not enjoined from such violation by the

22   Court, Defendant Wells Fargo will continue to engage in conduct that disregards the

23   rights of Plaintiffs and members of the Class, and cause Plaintiffs and members of the

24   Class irreparable injury for which there is no adequate remedy at law. 15 U.S.C. §

25   1691(e).

26     84.   Plaintiffs and members of the Class ask this Court to declare the rights of

27   the parties herein regarding Defendant Wells Fargo's obligation to participate in credit

28

1  transactions without discriminating against applicants for credit on the basis of the

2  applicants' race.

3                               **PRAYER FOR RELIEF**

4         WHEREFORE PREMISES CONSIDERED, Plaintiffs requests the following

5  relief:

6         A.    An order determining that the action is a proper class action pursuant to

7  Rule 23 of the Federal Rules of Civil Procedure;

8         B.    A Judgment awarding Plaintiffs and Class Members costs and

9  disbursements incurred in connection with this action, including reasonable attorneys'

10  fees, expert witness fees and other costs;

11         C.    A Judgment granting extraordinary equitable and/or injunctive relief as

12  permitted by law or equity, including rescission, restitution, reformation, attaching,

13  impounding, or imposing a constructive trust upon, or otherwise restricting, the

14  proceeds of Defendant's ill-gotten funds to ensure that Plaintiffs and Class Members

15  have an effective remedy;

16         D.    A Judgment awarding damages, including punitive damages, to Plaintiffs

17  and Class Members;

18         E.    A Judgment granting declaratory and injunctive relief and all relief that

19  flows from such injunctive and declaratory relief; and

20         F.    A Judgment or other Order granting such other and further relief as the

21  Court deems just and proper including, but not limited to, recessionary relief and

22  reformation.

23                               **JURY TRIAL DEMANDED**

24         85.    Plaintiff demands a trial by jury on all issues so triable.

25

26

27

28

1    DATED this 21st day of August, 2007.

2

3                                    BONNETT, FAIRBOURN,
                                     FRIEDMAN, & BALINT, P.C.
4

5

6                                    Andrew S. Friedman
                                     Wendy J. Harrison
7                                    2901 North Central Avenue, Suite 1000
                                     Phoenix, Arizona 85012
8

9                                    CHAVEZ & GERTLER, L.L.P.
10                                   Mark A. Chavez
                                     42 Miller Avenue
11                                   Mill Valley, California 94941

12

13                                   Attorneys for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    - 20 -

# EXHIBIT 1

| L. SETTLEMENT CHARGES | Paid from Borrower's Funds at Settlement | Paid from Seller's Funds at Settlement |
|---|---|---|
| 700. Based on Price $ @ % = | | |
| Division of Commission (line 700) follows: | | |
| 701. $        to | | |
| 702. $        to | | |
| 703. Commission paid at settlement | | |
| 704. | | |
| 800. ITEMS PAYABLE IN CONNECTION WITH LOAN | | |
| 801. Loan Origination Fee 1.5% to Phoenix Home Loans | 2,632.50 | |
| 802. Loan Discount Fee | | |
| 803. Appraisal Fee to Phoenix Home Loans | 400.00 | |
| 804. Credit Report to Phoenix Home Loans | 14.76 | |
| 805. Lenders Inspection Fee | | |
| 806. Mortgage Insurance Application Fee | | |
| 807. Assumption Fee | | |
| 808. Underwriting Fee to Wells Fargo Bank, N.A. | 495.00 | |
| 809. Processing Fee to Phoenix Home Loans | 995.00 | |
| 810. Flood Certification to Wells Fargo Bank, N.A. | 16.00 | |
| 811. ***See attached for breakdown | 75.00 | |
| 900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE | | |
| 901. Interest from 09/27/05 to 10/01/05 @$33.42/day (4 days) | 133.68 | |
| 902. Mortgage Insurance Premium | | |
| 903. Hazard Insurance Premium | | |
| 904. | | |
| 905. | | |
| 1000. RESERVES DEPOSITED WITH LENDER | | |
| 1001. Hazard Insurance 7 months @$46.54 per month | 325.78 | |
| 1002. Mortgage Insurance | | |
| 1003. City Property Taxes | | |
| 1004. County Property Taxes 2 months @$134.99 per month | 269.98 | |
| 1005. Annual Assessments | | |
| 1006. | | |
| 1007. | | |
| 1008. Aggregate Adjustment   months @$ | 135.00- | |
| 1100. TITLE CHARGES | | |
| 1101. Settlement or closing fee to Transnation Title Insurance Company | 260.00 | |
| 1102. Abstract or title search | | |
| 1103. Title examination | | |
| 1104. Title Insurance binder | | |
| 1105. Document preparation | | |
| 1106. Notary fees to On The Run Notary | 100.00 | |
| 1107. Attorney's Fees | | |
| (includes above item numbers: ) | | |
| 1108. Title Insurance | | |
| (includes above item numbers: ) | | |
| 1109. Lender's coverage $  175,500.00 | | |
| 1110. Owner's coverage $ | 459.00 | |
| Lender's coverage $ | | |
| Lender's coverage $ | | |
| 1111. 3r, 6, 8.1, ARM End's to Transnation Title Insurance Company | 150.00 | |
| 1112. Courier Fee to Transnation Title Insurance Company | 40.00 | |
| 1113. EDoc Fee to Transnation Title Insurance Company | 25.00 | |
| 1200. GOVERNMENT RECORDING AND TRANSFER CHARGES | | |
| 1201. Recording Fees: | | |
| 1202. City/County tax/stamps | | |
| 1203. State tax/stamps | | |
| 1204. City Transfer Tax | | |
| 1205. County Transfer Tax | | |
| 1206. Recording Service Fee to Transnation Title Insurance Company | 30.00 | |
| 1207. Recording of Deeds to Transnation Title Insurance Company | 20.00 | |
| 1300. ADDITIONAL SETTLEMENT CHARGES | | |
| 1301. Survey to | | |
| 1302. Pest Inspection | | |
| 1303. 1st Half 2005 Property Taxes to Pinal County Treasurer | 805.87 | |
| 1304. Account Payoff to Capital One Bank | 1,540.00 | |
| 1305. Account Payoff to CBUSA Sears | 358.00 | |
| 1306. Account Payoff to GEMB Care Credit | 1,583.00 | |
| 1307. **See attached for breakdown | 3,069.00 | |
| 1400. Total Settlement Charges (Enter on line 103,Section J and line 502, Section K) | 16,795.56 | 0.00 |

Hude.rpt (12/17/2003)

ase 3:07-cv-04009-MMC    Document 1-2    Filed 06/21/2007    Page 23 of 2

A. SETTLEMENT STATEMENT

Transnation Title Insurance Company
7310 N. 16th St.
Suite 135
Phoenix, AZ 85020
FINAL

6. BROKER FILE NUMBER: 01479635-238 T02
7. LOAN NUMBER: 0147839203
8. MORTGAGE INSURANCE CASE NUMBER:

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(P.O.C)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME OF BORROWER: Gilbert Ventura Sr. and Tracy D. Ventura

ADDRESS OF BORROWER: 1138 East Avenida Isabela, Casa Grande, AZ 85222

THIS IS TO CERTIFY THAT THIS IS A TRUE FULL AND COMPLETE COPY OF THE ORIGINAL
LANDAMERICA TRANSNATION
BY:

E. NAME OF SELLER:
ADDRESS OF SELLER:

F. NAME OF LENDER: Wells Fargo Bank, N.A.
ADDRESS OF LENDER: 2701 Wells Fargo Way, Minneapolis MN 55467-8000

G. PROPERTY LOCATION: 1138 East Avenida Isabela, Casa Grande, AZ 85222
Pinal 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
Lot(s) 227, of Rancho Grande Unit 5 Rental Cab C Sld 077; Sec 4-8S-6E

H. SETTLEMENT AGENT: Transnation Title Insurance Company
PLACE OF SETTLEMENT: 7310 N. 16th St., Suite 135, Phoenix, AZ 85020

I. SETTLEMENT DATE: 09/27/2005    PRORATION DATE: 09/27/2005    FUNDING DATE: 09/27/2005

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100. Gross Amount Due from Borrower: | | 400. Gross Amount Due to Seller: | |
| 101. Contract Sales Price | | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to Borrower (line 1400) | 15,795.56 | 403. | |
| 104. Payoff to National City Bank | 132,871.24 | 404. | |
| 105. | | 405. | |
| Adjustments For Items Paid By Seller In Advance: | | Adjustments For Items Paid By Seller In Advance: | |
| 106. City/Town Taxes | | 406. City/Town Taxes | |
| 107. County Taxes | | 407. County Taxes | |
| 108. Assessments | | 408. Assessments | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 120. Gross Amount Due from Borrower | 148,666.80 | 420. Gross Amount Due to Seller | |
| 200. Amounts Paid By Or In Behalf Of Borrower | | 500. Reductions In Amount Due To Seller | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 175,500.00 | 502. Settlement charges to Seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Cash Payment @ Closing Costs | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments For Items Unpaid By Seller: | | Adjustments For Items Unpaid By Seller: | |
| 210. City/Town Taxes | | 510. City/Town Taxes | |
| 211. County Taxes | | 511. County Taxes | |
| 212. Assessments | | 512. Assessments | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| 220. Total Paid By/For Borrower | 175,500.00 | 520. Total Reduction In Amount Due Seller | |
| 300. Cash At Settlement From/To Borrower | | 600. Cash At Settlement To/From Seller | |
| 301. Gross amount due from Borrower (line 120) | 148,666.80 | 601. Gross amount due to Seller (line 420) | |
| 302. Less amount paid by/for Borrower (line 220) | 175,500.00 | 602. Less reductions in amount due Seller (line 520) | |
| 303. Cash TO Borrower | 26,833.20 | 603. Cash TO/FROM Seller | 0.00 |

Hudc.rpk (12/17/2003)

Printed by Tonjah Wilkins on 09/27/2005 at 04:31:59 PM

Attachments:

| Description | Buyer Amount | Seller Amount |
| --- | --- | --- |
| Wells Fargo Bank, N.A., 2701 Wells Fargo Way, Minneapolis MN 55467-6000, Loan# 01478392 | 175,500.00 | |
| Total of New Loans. | 175,500.00 | |

| Description | Buyer Amount | Seller Amount |
| --- | --- | --- |
| 812. Tax Service Fee to Wells Fargo Bank, N.A. | 78.00 | |
| 813. Mtg Broker Comp by WFB to Phoenix Home Loans    (Lender (82,632.50) POC) | | |
| Total as shown on HUD Page 2 Line #811. | 78.00 | |

| Description | Buyer Amount | Seller Amount |
| --- | --- | --- |
| 1308. Account Payoff to The HelpCard Process | 4,069.00 | |
| 1309. Account Payoff to Capital One Bank. | 455.00 | |
| 1310. Account Payoff to RC Wiley Home Furniture | 313.00 | |
| 1311. Account Payoff to Macy | 231.00 | |
| Total as shown on HUD Page 2 Line #1307. | 5,068.00 | |

Hudsum (12/17/2003)

Escrow Number:     01479635-238 T02

| | | |
|---|---|---|
| Payoff to: | National City Bank | Loan #: 992958-1 |
| | Payoff Department | |
| | 3232 Newmark Drive | |
| | Miamisburg, OH 45342 | |

| Description | Amount |
|---|---|
| Principal Balance | 132,871.24 |
| Total Payoff | 132,871.24 |

Total as shown on HUD line #104.     132,871.24

Hudo.rpt (12/17/2003)

Printed by Tonjah Wilkins on 09/27/2006 at 04:31:59 PM