**JUDGES COPY**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**    NOV 0 8 2007
**EASTERN DIVISION**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

---

JUDY WILLIAMS, individually and on behalf
of all others similarly situated,

                Plaintiff,

v.

WELLS FARGO BANK, N.A.

                Defendant.

---

CASE NO.:

**CLASS ACTION COMPLAINT**

07cv6342
JUDGE DER-YEGHIAYAN
MAG. JUDGE VALDEZ

---

## CLASS ACTION COMPLAINT

Plaintiff, on behalf of herself and a class of all others similarly situated, alleges as follows:

### INTRODUCTION

1.      Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"), one of the nation's largest mortgage lenders, has demonstrated an established pattern and practice of racial discrimination in the financing of residential home purchases. Through these actions, Defendant has violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* and the Civil Rights Act, 42 U.S.C. §§ 1981, 1982 *et seq.*

2.      This is a proposed national class action brought by Plaintiff on behalf of herself and a class of all other similarly situated Minority (defined below) homeowners subjected to Wells Fargo's discriminatory practices in obtaining their residential mortgage loans (hereinafter referred to as the "Class" or "Class Members"). Plaintiff seeks relief for herself and all other

members of the Class from the indefensible injustice resulting from Defendant's unlawful business practices.

3.      For purposes of this Complaint, "Minority" or "Minorities" shall refer to any and all non-Caucasian/White racial groups protected under the Equal Credit Opportunity Act, the Fair Housing Act and the Civil Rights Act, including, without limitation, African-Americans and Latinos.  Additionally, for the purposes of this Complaint, "mortgage" refers to any loan made for the purpose of purchasing, constructing, improving, repairing or maintaining a dwelling, or a loan secured by residential real estate.

4.      The mortgage lending industry has a long history of racial discrimination, offering Minorities products and terms that are drastically worse than those given to their similarly-situated Caucasian counterparts.  Recently, the Federal Reserve Board confirmed that African-Americans and other Minorities are still more likely to pay higher prices for mortgages than Caucasians.

5.      According to the Federal Reserve Board's Survey of Consumer Finances, a triennial survey of the balance sheet, pension, income, and other demographic characteristics of U.S. families, 47% of African-Americans and Latinos are homeowners, compared with 74% of Caucasians.

6.      In 2003, the National Community Reinvestment Coalition ("NCRC") released a report on credit discrimination titled, "The Broken System:  Discrimination and Unequal Access to Affordable Loans by Race and Age,"[1] that indicated that consumers living in areas with more Minority residents are more likely to have mortgages with interest rates higher than the "prevailing and competitive" rates, often because of discrimination in lending.

---

[1] This report is available at http://ncrc.org/policy/cra/documents/ncrcdiscrimstudy.pdf/.

2

7.    Home Mortgage Disclosure Act ("HMDA") Data for 2006 revealed that African-American and Latino borrowers are more likely to obtain higher priced loans than are Caucasian borrowers.[2]  The data indicated that African-American homeowners who received sub-prime mortgage loans were much more likely to be issued a higher-rate loan than Caucasian borrowers with the same qualifications.

8.    In 2006, the Center for Responsible Lending, a non-profit research organization, uncovered "large and statistically significant" differences between the rates of sub-prime loans offered to African-Americans and Caucasians, even when income and credit risk were taken into consideration.  Compared to their otherwise similarly-situated Caucasian counterparts, African-Americans were 31-34% more likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate loans.  Those numbers were even higher for loans containing prepayment penalties, which accounted for over 60% of the loans issued to African-American mortgagees.[3]

9.    Findings in a study[4] released by the NCRC in July 2007 confirm that institutions in at least six urban areas engaged in "pervasive discriminatory and predatory practices." Such practices include offering high cost sub-prime loans to higher-qualified African-Americans 54% of the time, compared to 23% of the time for Caucasians, even when Caucasian applicants were similarly or less qualified.

10.    Sub-prime loans to African-Americans and other Minorities not only impose higher interest rates, they are typically laden with excessive, unreasonable and often improperly

---

[2] This report is available at www.ffiec.gov./hmda/.

[3] "Unfair Lending:  The Effect of Race and Ethnicity on the Price of Subprime Mortgages," available at www.responsiblelending.org.

[4] "Income is no Shield Against Racial Differences in Lending," available at  http://ncrc.org

disclosed fees as well. Such fees include high prepayment penalties which make it impossible for borrowers to later refinance at a competitive and fairer rate. The Center for Responsible Lending estimates that families lose $2.3 billion each year from their home equity wealth because of prepayment penalties in sub-prime mortgage loans—representing a transfer of wealth from working families to large, institutional lenders. African-Americans are more than three times as likely as Caucasians to be put into one of these equity-draining sub-prime loans. *See* n. 3.

11.     Wells Fargo demonstrated the worst disparity for any individual lending group in a joint report conducted by the California Reinvestment Coalition, Community Reinvestment Association of North Carolina, Empire Justice Center, Massachusetts Affordable Housing Alliance, Neighborhood Economic Development Advocacy Project, and the Woodstock Institute in March of 2007 ("2007 Joint Report").[5] The study discussed higher cost home purchase lending in six metropolitan areas (Boston, Charlotte, Chicago, Los Angeles, New York City and Rochester) during 2005. In Chicago, the study indicated that African-American borrowers were fourteen times more likely to receive a higher-cost home purchase loan from Wells Fargo than were Caucasian borrowers (35.3% versus 2.5%).

12.     These significant statistical disparities are not mere coincidences. They are the result of a systematic and predatory policy of targeting Minority borrowers for high cost loans. Wells Fargo's business practices include implementing and maintaining policies that discriminate against Minorities. Plaintiff brings this lawsuit to seek relief from the harms suffered as a result of Wells Fargo's practices and to enjoin Defendant from continuing its discriminatory practices.

---

[5] *See* "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending," available at www.woodstockinst.org.

## THE PARTIES

**Plaintiff**

13.     Plaintiff Judy Williams is a Minority homeowner, gainfully employed by the Boys & Girls Clubs of Chicago. On June 29, 2006, Ms. Williams purchased a condominium unit located at 1360 E. Madison Park, #B, Chicago, Illinois. The purchase was financed by Wells Fargo. At the time of application, Ms. Williams was a current homeowner, was gainfully employed with an income of approximately $60,000/year and paid approximately $7,550 as a cash deposit.

14.     Ms. Williams was unaware of the costs of her loan until very shortly before or the day of closing. For instance, prior to the closing of her loan, Wells Fargo provided Ms. Williams with at least three different rate quotes for her loan. The first quote was for an interest rate of 7.1%; the second quote was for 9.3%; the third quote was for 8.3%. The first quote provided to Ms. Williams provided for one loan for the entire purchase price of $167,000, an interest rate of 7.1% and, importantly, no prepayment penalty. However, the financing package actually provided to Ms. Williams provided for two loans—which she did not request. The first loan was a 30-year ARM for 80% of the purchase price. The loan had an initial interest rate of 8.125% and is due to reset on July 1, 2008, at which time may increase to as high as 11.125%. The second loan, for the balance, was a 30-year fixed rate mortgage with an interest rate of 12.5%.

15.     Further, with respect to her first loan, despite language in her Promissory Note that provided for an unfettered right to prepay the loan in full or in part, Ms. Williams was instructed to sign a "Prepayment Rider." The Prepayment Rider burdened Ms. Williams with a harsh prepayment penalty, stating that if she made full repayment of her loan (i.e., refinanced) within the first two years after the date of her note (i.e., prior to June 29, 2008), she must pay a

"prepayment charge." The prepayment charge is equal to 3% of the *original principal amount* within the first year after closing and 2% of the original principal amount during the second year after closing. Thus, this provision essentially prohibited Ms. Williams from refinancing into a less expensive loan. Further, Ms. Williams' ARM was pegged to "reset" on July 1, 2008, but, as stated above, she was could not refinance prior to June 29, 2008 without incurring a prepayment penalty. Thus, in effect, Ms. Williams was truly trapped in her loan—her loan was purposefully designed so that the only way for her to refinance prior to the interest rate adjustment date (and, thus, avoid an increased mortgage payment), was to do so within the very narrow time period between June 29, 2008 and July 1, 2008.

16.    Prior to closing, Ms. Williams questioned Wells Fargo as to the reason that she was being charged such a high interest rate and attempted to obtain a lower rate. However, despite sending requested additional documents, calling Wells Fargo and leaving multiple messages, she received no response whatsoever. Ms. Williams also questioned the reason for her prepayment penalty, but was not provided with a legitimate justification.

17.    Ms. Williams is now trapped in a high cost loan, due to Wells Fargo's discriminatory practices and/or policies that have had a disparate impact upon Minority borrowers.

**Defendant**

18.    Wells Fargo is a corporation organized under the laws of the State of Delaware with its principal place of business located at 464 California St., San Francisco, California, 94104, and is engaged in the business of issuing sub-prime mortgage loans throughout the United States in a manner and standardized practice that violates the laws identified herein.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343. This is an action for violation of the Fair Housing Act, 42 U.S.C. §3601 *et seq.*, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, and the Civil Rights Act, 42 U.S.C. § 1981 *et seq.*

20.    Venue is proper in this district under 28 U.S.C. § 1391 because Defendant resides in this district, within the meaning of 28 U.S.C. § 1391(c) and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred, or a substantial part of property that is the subject of this action is situated, in this district.

## CLASS ACTION ALLEGATIONS

21.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and/or 23(b)(3) on behalf of the following (the "Class"):

> All Minority persons in the United States who obtained a residential mortgage loan from Wells Fargo between January 1, 2001 and the present with less favorable terms and higher costs as a result of Well's Fargo's racially discriminatory policies and/or practices.

22.    The Class is so numerous that joinder of all members is impracticable.

23.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

24.    Plaintiff's claims are typical of the claims of the Class.  Plaintiff and the Class were harmed by the same course of conduct and seek recovery under the same legal theories.

25.    There are questions of law and fact common to the Class, including but not limited to:

> a)    Whether Defendant has a policy or practice of discriminating against Class Members by charging them higher interest, fees and other costs for home mortgage loans than it charges to Caucasians with similar credit scores or creditworthiness;

7

b) Whether Defendant has policies or practices that have had a disparate impact upon Minority borrowers

c) Whether Defendant's policies and practices have caused damage and injury to Plaintiff and the Class entitling them to injunctive and declaratory relief, and the measure of that relief;

d) Whether Defendant can articulate a legitimate non-discriminatory reason for its practices and procedures which are discriminatory;

e) Whether Defendant has any business justification for its practices and procedures that cause a disparate impact upon Minorities;

f) Whether there is a less discriminatory alternative to these practices;

g) Whether Plaintiff and Class Members have sustained damages, and, if so, the proper measure of those damages.

26.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class Members.

27.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class action litigation. Plaintiff has no claims antagonistic to those of the Class. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

28.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant.

29.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

8

30.    Class action status is also warranted under Rule 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

31.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the Class Members predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FRAUDULENT CONCEALMENT/EQUITABLE TOLLING**

32.    Applicable statutes of limitation may be tolled based upon principles of equitable tolling, fraudulent concealment and/or the discovery rule. In this case, it would be inequitable to permit the applicable statutes of limitation to bar the claims of any absent Class Member.

33.    First, Wells Fargo knowingly and actively concealed the basis for the Plaintiff's claims by engaging in a scheme that was, by its very nature and purposeful design, self-concealing. Not only did Wells Fargo fail to disclose its discriminatory practices/policies and procedures that had a disparate impact upon Minority borrowers, but it took affirmative steps to conceal them.

34.    As one of the largest mortgage lenders in the United States, Wells Fargo knew or should have known that its policies and procedures, including, without limitation, its credit pricing system and the manner in which it trains and incentivizes its employees/agents causes Minorities to pay higher amounts for mortgage financing than similarly-situated Caucasian customers.

35.    Wells Fargo affirmatively and intentionally concealed its discriminatory practices. The Company spent millions of dollars annually on advertising and marketing,

9

intentionally targeting Minority borrowers with false and misleading information. These materials were designed to create and foster the image that Defendant offers all Minority borrowers competitive, low-cost residential mortgage loans that are objectively set. Upon information and belief, Wells Fargo also affirmatively concealed disproportionately high loan costs and fees, such as large prepayment penalties, the interest rate increases and prepayment penalties, add-on fees, unjustified interest rate hikes, etc. Wells Fargo never disclosed and affirmatively concealed the truth concerning the fact that: (a) its credit rates are subjective and can vary significantly among persons with identical credit profiles, and (b) it has authorized and provided a financial incentive to mortgage brokers to subjectively increase the credit rate above the rate otherwise available to homeowners, as well as increase other finance charges.

36.    Second, any delay by the Class Members is clearly excusable. In addition to the reasons stated above, as a practical matter, victims of lending discrimination may not even realize that they received disparate terms until—if ever—years after the loan closes. Here, the Class Members could not, despite the exercise of due diligence, have discovered the underlying basis for their claims. For these reasons, any delay by the Class Members whose claims accrued outside of any applicable statutes of limitation was excusable. Thus, to the extent that any applicable statute of limitations would bar the claim of any absent Class Members, such statute should be equitably tolled.

37.    Accordingly, Plaintiff respectfully submits that it would be inequitable to permit the applicable limitation periods to preclude the claim of any Plaintiff or member of the proposed Class, as doing so would, essentially reward Defendant for concealing its unlawful conduct.

## FACTUAL ALLEGATIONS

38.    Wells Fargo originates and funds mortgage loans through loan officers, brokers and a network of other lenders, serving all 50 states through approximately 2,400 mortgage and Wells Fargo banking stores, and the Internet.

39.    Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A.

40.    Wells Fargo Home Mortgage is one of the nation's largest retail mortgage lender and servicers of home mortgages.  It has a pervasive presence, through approximately 2,400 mortgage stores and bank branches, call centers, an Internet presence and wholesale lending operations. Wells Fargo Home Mortgage services loans for more than 7.8 million customers.

41.    Owning a home is fundamental for one's economic security and the chief means by which families build wealth.  Home equity accounts for more than one-third of the average net wealth of U.S. households.  Studies demonstrate that this percentage is even greater for Minorities.

42.    During the last decade, Minorities have been purchasing record numbers of homes, leading to a multi-year housing boom.  They account for 49% of the increase in home ownership from 1995 to 2005, according to Harvard University's Joint Center for Housing Studies.[6] Nonetheless, Minority home ownership is marred by sub-prime loans, excess fees and higher costs than their Caucasian counterparts.

43.    Sub-prime loans are higher-cost mortgage products that are in theory given to borrowers who are undesirable loan candidates.  In the last decade, an entire sub-prime industry has grown out of the greater profits generated by the higher rates and exorbitant fees charged to these "high-risk" borrowers.  This industry has inappropriately and unlawfully maximized its

---

[6] Available at www.jchs.harvard.edu/son/index.htm.

11

profits by directing borrowers with relatively good credit to sub-prime mortgages, especially Minority borrowers.

44.    In a recent study released on September 5, 2007, the Association of Community Organizations for Reform Now ("ACORN"), one of the nation's largest community organizations of low- and moderate-income families, found that, nationally, African-American home purchasers were **2.7 times more likely** and Latinos were **2.3 times more likely** than Caucasian borrowers to be issued a problematic, subprime loan.   Additionally, the ACORN study, available at www.acorn.org, found that nationally, for refinance loans, African-Americans were **1.8 times more likely** and Latinos were **1.4 times more likely** than Caucasian borrowers to be issued a problematic, subprime loan.

45.    Differences in economic status are not to blame.   These racial disparities were found to persist even among borrowers of the same income level.   The ACORN study found that, among upper-income home purchasers (defined as persons with incomes 120% or greater than the area median income for their metropolitan area), African-Americans  were **3.3 times more likely** and Latinos were **3 times more likely** than similarly-situated Caucasians to be issued a high-cost, subprime loan.   Further, the ACORN study found that, with respect to refinance loans, among upper-income borrowers, African-Americans and Latinos were **1.7 times more likely** than similarly-situated Caucasians to be issued a high-cost, subprime loan.

46.    While some borrowers in the sub-prime market are genuine credit risks, Minority borrowers have been preyed upon by mortgage lenders and illegally steered into sub-prime loans. Defendant has engaged in this predatory lending by refusing to offer Minority borrowers the prime loans offered to similarly-qualified Caucasian borrowers.

47.     Studies by Freddie Mac and Standard & Poor's have found that 20% to 30% of borrowers who receive sub-prime mortgages could have qualified for traditional mortgages at the lower rates offered by banks to prime borrowers. This seriously disadvantages the borrower by effectively diluting the equity of the property, placing the borrower in jeopardy of default, and forcing the borrower to spend years paying off additional loan balances without developing any equity in their home.

48.     Further, the U.S. Department of Housing and Urban Development found that in neighborhoods where at least 80 percent of the population is African-American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a sub-prime lender. Higher-income borrowers living in predominately African-American neighborhoods are twice as likely as lower-income Caucasian borrowers to have sub-prime loans.[7]

49.     The predatory lending practices of the Defendant and other mortgage lenders lead to dire financial consequences for borrowers. Earlier this year, over eighty consumer groups wrote to federal banking agencies about a particular type of sub-prime loan, the adjustable rate mortgage (ARM). An ARM typically contains an average built-in "shock payment" increase of 29%, even if interest rates remain unchanged. Fitch Ratings reports that the actual payment shock may be as high as 48%. The majority of sub-prime loans made to Minorities had these adjustable rates. The Center for Responsible Lending estimates that 2.2 million such sub-prime loans have ended or will end in foreclosure, a rate of 19%.

50.     Wells Fargo originates and funds mortgage loans through loan officers, brokers and through a network of correspondent lenders. Loan officers, mortgage brokers and correspondent lenders that work with Wells Fargo are required to act in conformance with its

---

[7] *See* "All Other Things Being Equal: A Paired Testing Study of Mortgage Lending Institutions," 2002, available at www.huduser.org.

credit-pricing policies and procedures. As Wells Fargo's website explains, mortgage brokers "match borrowers with lenders." (https://www.wellsFargo.com/mortgage/glossary/m (last viewed November 7, 2007).) Wells Fargo's website states that correspondent lenders "originate, underwrite, and close loans before sending them to Wells Fargo[.]" (https://www.wellsFargo.com/com/third_party_mortgage/ (last viewed November 7, 2007).)

51.     Wells Fargo has authorized and followed -- and continues to follow -- discretionary loan pricing procedures that cause a disproportionately large number of Minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-Minority borrowers. Wells Fargo has intentionally discriminated against Plaintiff and Class Members through these policies and procedures- systematically giving them mortgage loans with less favorable conditions than were given to similarly situated non-Minority borrowers. This pattern of discrimination is not the result of random or non-discriminatory factors. Rather, it is a direct result of Wells Fargo's mortgage lending policies and procedures which vest subjectivity and discretion in its employees.

52.     Wells Fargo's authorized loan officers, mortgage brokers and correspondent lenders receive part or all of their compensation from Wells Fargo based on the interest rate charged to the borrower. Upon information and belief, Wells Fargo's loan officers, authorized brokers and correspondent lenders receive more compensation from Wells Fargo when they steer their clients into Wells Fargo loans with higher interest rates, and less compensation when they place their clients into Wells Fargo loans with lower interest rates.

53.     Wells Fargo intentionally and actively implements this discriminatory credit-pricing policy in a number of ways.

14

54.    Wells Fargo actively educates its loan officers and brokers in Wells Fargo's credit policies and procedures. Wells Fargo conducts weekly training "webinars" (i.e., interactive Internet seminars) for its brokers concerning its loan products where it disseminates to brokers "detailed information on [Wells Fargo's] product guidelines[.]" (https://ilnet.wellsFargo.com/ildocs/ee/training.html (last viewed on November 7, 2007).) Wells Fargo also maintains an internet site called "Broker's First" that supplies brokers with rate sheets, a "Broker Guide," and underwriting guidelines.

55.    Wells Fargo actively directs its loan officers and brokers in marketing Wells Fargo's loans. For example, Wells Fargo provides its authorized brokers with downloadable residential mortgage loan advertisements.[8]

56.    Wells Fargo's credit-pricing policies permit and encourage its authorized loan officers, mortgage brokers and correspondent lenders to subjectively charge certain loan applicants yield spread premiums and other discretionary charges, including minority loan applicants.

57.    Wells Fargo discriminates through its authorized mortgage brokers. Authorized mortgage brokers act as Wells Fargo's agents in originating mortgage loans. Authorized mortgage brokers: (a) enter into agreements with Wells Fargo to accept loan applications on behalf of Wells Fargo; (b) communicate to loan applicants financing terms and rates set by Wells Fargo; (c) tell loan applicants about Wells Fargo's various financing options; and (d) ultimately originate mortgage loans funded by Wells Fargo using Wells Fargo's forms and in accordance with Defendant's policies and procedures.

58.    Likewise, Wells Fargo's authorized correspondent lenders and loan officers also act as Wells Fargo's agents in originating loans. Correspondent mortgage lenders and loan

officers that work with Wells Fargo make loans in accordance with Wells Fargo's credit policies and procedures. Wells Fargo funds correspondent-generated loans before or shortly after they go to closing.

59.    Wells Fargo, then, funds loans originated by its loan officers, authorized mortgage brokers and correspondent lenders, sets the terms and conditions of credit on those loans, and shoulders part or all of the credit risk on such loans. Wells Fargo actively and intentionally enforces its credit policies through its authorized loan officers, mortgage brokers and correspondent lenders in a variety of ways. Among other things, Wells Fargo supplies its loan officers, correspondent lenders and mortgage brokers with an array of loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts.

60.    Once a loan applicant has provided credit information to Wells Fargo through a loan officer, mortgage broker or correspondent lender, Wells Fargo evaluates numerous risk-related credit variables, including debt-to-income ratios, loan-to-value ratios, credit bureau histories, bankruptcies, automobile repossessions, prior foreclosures, payment histories, credit scores and the like.

61.    Wells Fargo derives a risk-based financing rate from these objective factors, which Wells Fargo and others in the mortgage industry simply call the "par rate." (Wells Fargo's brokers and correspondent lenders can also estimate the par rates by referring to an applicant's credit bureau-determined credit score.)

62.    Although Wells Fargo's initial analysis applies objective criteria to calculate this risk-related interest rate, Wells Fargo as a matter of policy and procedure authorizes its loan officers, brokers and correspondent lenders to mark up that rate later, and also impose additional

---

[8] https://ilnet.wellsFargo.com/ildocs/ee/marketing_tools.html (last view on November 7, 2007).

non-risk-based charges including yield spread premiums, and other discretionary fees. Wells Fargo regularly communicates applicable par rates, authorized yield spread premiums, and other discretionary fees to its loan officers, brokers and correspondent lenders via "rate sheets" and other communications.

63.    Wells Fargo gives its loan officers, authorized mortgage brokers and correspondent lenders discretion to impose yield spread premiums and other subjective fees on borrowers. When borrowers pay yield spread premiums, Wells Fargo shares in additional income generated by the premium because the yield spread premium-affected borrowers are locked into a higher interest rate going forward on their Wells Fargo loan than they would be if they had been placed in a par rate loan without a yield spread premium.

64.    Wells Fargo's policies and procedures authorizing the subjective assessment of yield spread premiums and other discretionary fees cause persons with identical or similar credit scores to pay differing amounts for obtaining credit. Such subjective loan pricing- which by design imposes differing finance charges on persons with the same or similar credit profiles-disparately impacts Wells Fargo's Minority borrowers.

65.    Wells Fargo's use of yield spread premiums and other discretionary fees disproportionately and adversely affects Minorities (relative to similarly situated non-minorities). Wells Fargo's credit policies cause Minorities to pay disparately more discretionary finance charges than similarly situated non-minorities. As the HMDA data and other studies cited *infra* indicate, Minorities are substantially more likely than similarly situated non-minorities to pay such charges.

66.    The March 2007 Joint Report (see n. 5) further notes that Wells Fargo's African-American home purchase loan borrowers were ten times more likely to get a higher-cost home

17

loan than Caucasian borrowers, overall, and 14.3% more likely to receive higher-cost home loans in Chicago, specifically. Further, in Chicago, Latino borrowers demonstrated a 5.2% lending disparity ratio when compared to Caucasian counterparts. *(See tables from study below)*

**Table 2. African American/White Home Purchase Lending Disparity Ratios by Lender Group and Metropolitan Area, 2005**

| Lender Group | Boston | Charlotte | Chicago | Los Angeles | New York | Rochester | Weighted Average |
|---|---|---|---|---|---|---|---|
| Citigroup | 0.0 | 5.0 | 4.2 | 7.9 | 5.6 | 1.8 | 5.0 |
| Countrywide | 3.1 | 2.9 | 5.6 | 5.9 | 5.3 | 3.3 | 4.9 |
| GMAC | 3.2 | 3.4 | 8.8 | 2.8 | 17.2 | 6.3 | 5.8 |
| HSBC | 3.1 | 5.6 | 1.6 | 2.1 | 8.8 | 3.4 | 3.0 |
| JP Morgan Chase | 3.7 | 2.2 | 4.0 | 5.7 | 5.7 | 4.7 | 3.5 |
| Washington Mutual | 4.4 | 1.3 | 3.3 | 5.9 | 9.8 | 1.0 | 4.0 |
| Wells Fargo | 9.1 | 5.4 | 14.3 | 11.2 | 9.1 | 4.5 | 10.0 |
| Seven Lenders Combined | 5.7 | 4.9 | 5.7 | 6.8 | 12.5 | 3.3 | 6.0 |

**Table 3. Latino/White Home Purchase Lending Disparity Ratios by Lender Group and Metropolitan Area, 2005**

| Lender Group | Boston | Charlotte | Chicago | Los Angeles | New York | Rochester | Weighted Average |
|---|---|---|---|---|---|---|---|
| Citigroup | 0.0 | 0.0 | 2.0 | 2.9 | 2.4 | 3.2 | 1.8 |
| Countrywide | 1.5 | 1.7 | 2.5 | 5.7 | 1.9 | 1.9 | 2.9 |
| GMAC | 1.2 | 4.5 | 4.2 | 1.8 | 13.8 | 6.3 | 2.4 |
| HSBC | 3.1 | 0.0 | 1.5 | 2.1 | 12.2 | 2.0 | 3.8 |
| JP Morgan Chase | 7.7 | 5.0 | 2.3 | 14.2 | 3.0 | 2.3 | 3.5 |
| Washington Mutual | 4.7 | 1.3 | 2.9 | 5.5 | 8.7 | 2.0 | 3.5 |
| Wells Fargo | 3.7 | 2.4 | 5.2 | 7.9 | 5.3 | 2.4 | 3.3 |
| Seven Lenders Combined | 5.0 | 3.1 | 4.1 | 6.9 | 7.8 | 2.6 | 4.8 |

18

67.    Wells Fargo's credit policy is in fact intentionally discriminatory. As described above, Wells Fargo's credit pricing policy by design discriminates against Minority borrowers.

68.    While long suspected, this discrimination has only recently been disclosed and quantified. It has only been in the last few years that mortgage lenders have been required to submit details of their sub-prime home loans under the Home Mortgage Disclosure Act. The groups that have studied predatory lending and the mortgage market have uncovered incredible racial disparities in the types of mortgages offered.

69.    By placing Minority mortgagors into higher-priced sub-prime loans because of their race, Defendant violates the Fair Housing Act, the Equal Credit Opportunity Act, and the Civil Rights Act. These violations entitle the Plaintiff and Class Members to the declaratory and injunctive relief provided under the Acts.

## COUNT I:
## VIOLATIONS OF THE FAIR HOUSING ACT
### (42 U.S.C. §3601 et seq.)

70.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

71.    Plaintiff and her putative class members are members of a protected class under the Fair Housing Act.

72.    Plaintiff was qualified to receive a loan with more favorable credit terms and associated costs. Yet Defendant issued her a loan with terms less favorable and with higher associated costs, despite her qualifications, while Defendant offered loans with more favorable terms and lower associated costs to non-minorities with the same or similar qualifications as Plaintiff.

73.    The Fair Housing Act was enacted in 1968 to prohibit discrimination in connection with real estate transactions such as purchasing and refinancing a home. The Fair Housing Act has been broadly construed by the courts to protect consumers.

74.    The Fair Housing Act prohibits mortgage lenders from imposing different terms or conditions on a loan on the basis of race. Defendant targeted Minorities for higher cost sub-prime mortgage loans, while directing similarly-qualified Caucasian applicants into lower cost loans.

75.    Defendant engaged in residential real estate-related transactions with respect to the Plaintiff and all prospective Class Members.

76.    Defendant's discretionary pricing policies have resulted in discrimination with respect to the Plaintiff and all prospective members of the Class.

77.    As a result of Defendant's discretionary pricing policies, Defendant has collected more in finance charges from Minorities than from similarly situated Caucasian persons, for reasons unrelated to credit risk.

78.    Defendant's discretionary pricing policies violate the Fair Housing Act and constitute actionable discrimination on the basis of race.

79.    Plaintiff and the Class Members are aggrieved persons as defined in the Fair Housing Act by virtue of having been subjected to Defendant's discriminatory discretionary pricing policies.

## COUNT II:
## VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT
### (15 U.S.C. §1691 et seq.)

80.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

20

81.    The Equal Credit Opportunity Act was first enacted in 1974 as a consumer protection statute prohibiting discrimination in the issuing of credit. The Equal Credit Opportunity Act has been broadly construed by the courts in order to protect consumers.

82.    Plaintiff is an applicant as defined in the Equal Credit Opportunity Act.

83.    Defendant is a creditor as defined in the Equal Credit Opportunity Act and in the ordinary course of its business, participated in the decision of whether or not to extend credit to the Plaintiff and all prospective members of the Class.

84.    Plaintiff and Defendant engaged in a credit transaction as defined by the Equal Credit Opportunity Act.

85.    Defendant designed, disseminated, controlled, implemented and profited from the discriminatory policies and practices alleged herein, which have had a disparate economic impact on Minorities as compared to similarly situated Caucasians.

86.    All actions taken by Defendant's employees and brokers were in accordance with the specific authority granted to them by Defendant and were in furtherance of Defendant's policies and practices.

87.    As a result of Defendant's discretionary pricing policies, Defendant has collected more in finance charges and other fees from Minorities than from similarly situated Caucasian persons, for reasons totally unrelated to credit risk.

88.    Defendant's discretionary pricing policies are discriminatory and violate the Equal Credit Opportunity Act.

89.    Plaintiff and prospective members of the Class are aggrieved persons as defined in the Equal Credit Opportunity Act by virtue of having been subjected to the discriminatory pricing policies of Wells Fargo.

## COUNT III:
### VIOLATIONS OF THE CIVIL RIGHTS ACT: RACIAL DISCRIMINATION
### (42 U.S.C. §§ 1981, 1982 et seq.)

90.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

91.    The Civil Rights Act of 1866 and 1870, and later expanded in 1991, prohibits racial discrimination in the formation and issuance of contracts, and intentional interference to purchase and hold real property.

92.    Defendant intentionally discriminated against Plaintiff and the Class Members by charging them higher interest rates than those charged to similarly-situated Caucasian mortgagees.

93.    By charging higher rates to the Plaintiff and Class Members, Defendant unlawfully discriminated against them in the (i) formation of contracts, (ii) making, performance, modification, and termination of contracts, and/or (iii) the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship, and in their right to purchase and hold real property.

94.    Defendant's actions violate the Civil Rights Act. As a proximate result of Defendant's systematic violation of this statute, Plaintiff and the Class Members are entitled to the requested relief provided thereunder.


### PRAYER

WHEREFORE, Plaintiff, individually and on behalf of the putative Class Members, prays for entry of judgment as follows:

A.    Certify this case as a class action and certify the named Plaintiff herein to be an adequate Class representative and her counsel to be Class counsel;

22

B.   Enter a judgment, pursuant to 15 U.S.C. 1691e(c) and/or 42 U.S.C. § 3613, declaring the acts and practices of Defendant, complained of herein to be in violation of the Equal Credit Opportunity Act, the Fair Housing Act and the Civil Rights Act;

C.   Grant a permanent or final injunction, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), enjoining Defendant, and Defendant's agents, employees, affiliates and subsidiaries from continuing to discriminate against Plaintiff and the members of the Class because of their race through further use of any discretionary pricing policies or any non-risk-related discretionary pricing policy employed by Defendant;

D.   Order Defendant, pursuant to 15 U.S.C. §1691e(c) and/or 42 U.S.C. § 3613(c), to adopt and enforce a policy that requires appropriate training of Defendant's employees, mortgage specialists and network of mortgage brokers to prevent discrimination;

E.   Order Defendant, pursuant to. 15 U.S.C. §1691e(c) and/or 42 U.S.C. § 3613(c), to monitor and/or audit the racial pattern of its financings to ensure the cessation of discriminatory effects in its home mortgage transactions;

F.   Order disgorgement, pursuant to 15 U.S.C. §1691e (c), of all disproportionate non-risk charges imposed on Minorities by Defendant's discretionary pricing policies; and order the equitable distribution of such charges, as restitutionary relief, to all appropriate Class Members;

G.   Order actual and punitive damages to the Plaintiff and the Class pursuant to 42 U.S.C. §3613(c);

H.   Award Plaintiff the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees, pursuant to 15 U.S.C. §1691e(d) and/or 42 U.S.C. §3613(c); and

I.   Grant Plaintiff and the Class such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.


Dated: November 7, 2007


Respectfully Submitted,

**SCHIFFRIN BARROWAY TOPAZ &
KESSLER, LLP**

By: _____

Joseph H. Meltzer
Edward W. Ciolko
Joseph A. Weeden
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056


**ROBERT D. ALLISON & ASSOCIATES**
Robert D. Allison, I.D. #36749
Bruce C. Howard
Steven P. Schneck
122 S. Michigan Ave., Suite 1850
Chicago, IL 60603
Tel. 312 427-7600
Fax. 312 427-1850

LOCAL COUNSEL