ORIGINAL
FILED

JAN 23 PM 2: 37

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Lori E. Andrus (SBN 205816)
Micha Star Liberty (SBN 215687)
Jennie Lee Anderson (SBN 203586)
ANDRUS LIBERTY & ANDERSON LLP
1438 Market Street
San Francisco, CA 94102
Telephone: (415) 896-1000
Facsimile: (415) 896-2249
lori@libertylaw.com
micha@libertylaw.com
jennie@libertylaw.com

Barry W. Walker
THE WALKER LAW FIRM
Two 20th Street North, Suite 1320
Birmingham, Alabama 35203
Telephone: (205) 252-2770
Facsimile: (205) 252-2119
barry@bwwlawllc.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

C 08 0492

| | |
|---|---|
| RUBY KATHRYN BROWN, on behalf of herself and all others similarly situated, | Civil Case No.: |
| Plaintiff, | EDL |
| v. | **CLASS ACTION** |
| WELLS FARGO BANK, N.A., | **COMPLAINT** |
| Defendant. | **DEMAND FOR JURY TRIAL** |

Plaintiff Ruby Kathryn Brown ("Plaintiff") brings this action against Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant"), on behalf of herself and all other similarly situated African American homeowners ("Class Members"), pursuant to the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* (the "ECOA"), and the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ( the "FHA"), and alleges on information and belief as follows:

1

**INTRODUCTION**

1.      In issuing home mortgage loans to Plaintiff and Class Members, both directly and through its authorized mortgage brokers, Wells Fargo imposes a uniform credit pricing policy that includes both objective and subjective components.  The first component of the credit pricing policy is based on objective criteria, including the individual's credit history, credit score, debt-to-income ratio and loan-to-value ratios.  However, Wells Fargo also includes a subjective component in its credit pricing policy (the "Discretionary Pricing Policy").  Through the Discretionary Pricing Policy, Wells Fargo authorizes its officers and brokers to subjectively add discretionary charges and interest mark-ups to the loans they originate.

2.      While facially neutral in that the policy applies to all credit applicants, Wells Fargo's Discretionary Pricing Policy has an adverse, discriminatory impact on African American borrowers.  Specifically, the discriminatory policy causes African American homeowners to pay more for their home mortgage loans than similarly situated Caucasians, in violation of the FHA and the ECOA.

3.      To remedy the effects of this unlawful policy, as described in greater detail below, Plaintiff seeks declaratory and injunctive relief, disgorgement and restitution of monies disparately obtained from African American homeowners, as well as actual and punitive damages as appropriate.

**THE PARTIES**

4.      Plaintiff Ruby Kathryn Brown is an African American homeowner who resides in Calera, Alabama.

5.      Defendant Wells Fargo Banks, N.A. is a mortgage lender with its principal place of business at 464 Montgomery Street, San Francisco, California 94104.

**JURISDICTION AND VENUE**

6.      Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 1331, which confers original jurisdiction in a civil action arising under federal law.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a significant portion of the unlawful

- 2 -

1  discriminatory practice alleged was committed in this District, and because Wells Fargo regularly

2  conducts business in this District and maintains its principal place of business in this District.

3  ## FACTUAL ALLEGATIONS

4        7.     Wells Fargo is one of the largest mortgage lending companies in the United

5  States.  In the first quarter of 2007, Wells Fargo was among the nation's top five originators of

6  sub-prime loans.

7        8.     Wells Fargo offers home mortgage loans, including sub-prime loans,

8  directly through its more than 10,000 mortgage specialists in nearly 2,400 locations across the

9  country, and also through its network of authorized mortgage brokers, who are agents of Wells

10  Fargo.

11        9.     All Wells Fargo loans are subject to Wells Fargo's policies and are made

12  with the participation of Wells Fargo.  Within limitations set by Wells Fargo, Wells Fargo

13  authorizes its loan officers and mortgage brokers who have signed a contract with Wells Fargo to

14  accept loan applications, quote financing rates and terms, inform credit applicants of Wells

15  Fargo's financing options and originate finance transactions using Wells Fargo forms on Wells

16  Fargo's behalf and in accordance with its policies.  Wells Fargo's mortgage brokers are agents of

17  Wells Fargo for the purpose of setting credit prices pursuant to Wells Fargo's policy.

18        10.    Wells Fargo designed, controlled and implemented, and profits from, the

19  Discretionary Pricing Policy.  Wells Fargo advances the funds to its brokers to make the loans

20  and bears some or all of the risk of default.  Wells Fargo provides its brokers with credit

21  applications, loan contracts and other required financing forms, as well as instructions for filling

22  out such documents to complete home mortgage transactions.  Wells Fargo also provides

23  authorized mortgage brokers with information regarding its loan programs, rates and credit

24  criteria, as well as its policies for compensating mortgage brokers who arranged business

25  transactions on its behalf.

26  ## Wells Fargo's Discretionary Pricing Policy

27        11.    Wells Fargo's credit pricing policy contains both objective and subjective

28  components.  The subjective component—the Discretionary Pricing Policy—results in a disparate

1    impact on African Americans borrowers, who pay more in discretionary charges and interest

2    mark-ups under the Discretionary Pricing Policy than similarly situated Caucasians.

3            12.    After a borrower provides credit information to one of Wells Fargo's loan

4    officers or authorized brokers, Wells Fargo first computes a financing rate through an objective

5    credit analysis that determines the customer's general creditworthiness.

6            13.    The objective credit analysis considers numerous risk-related variables,

7    including but not limited to credit bureau histories, payment amounts, debt ratio, bankruptcies,

8    automobile repossessions, charge-offs, prior foreclosures, payment histories, credit score, and

9    debt to-income ratios, and allows Wells Fargo to compute a "mortgage score" for each credit

10    applicant.

11            14.    From the mortgage score, which is based on objective risk-related

12    variables, Wells Fargo derives a risk-based financing rate at which it would provide a home

13    mortgage, often called the "Par Rate."  Experienced loan officers and brokers may estimate the

14    risk-related Par Rate by referring to the applicant's credit bureau-determined credit score.

15            15.    While the Par Rate is based on objective criteria, Wells Fargo then adds a

16    subjective component to its credit pricing system as part of its Discretionary Pricing Policy,

17    which authorizes brokers and officers to impose additional non-risk charges.  Within the limits set

18    by Wells Fargo, brokers and officers impose discretionary mark-ups as additional points in

19    interest, known as "a rate mark-up."  When there is a rate mark-up, Wells Fargo shares the

20    additional income with the broker.  Both the applicable Par Rates and authorized discretionary

21    charges are set by Wells Fargo and communicated to brokers and officers via regularly published

22    "rate sheets" published by Wells Fargo via secure intranet and/or internet sites.

23            16.    The discretionary charges are imposed on customers as part of their total

24    finance charge (the "Contract Annual Percentage Rate" or "Contract APR"), however, the

25    customer does not know, and Wells Fargo fails to disclose to and/or conceals from the customer,

26    that a portion of their Contract APR was a non-risk-related charge.

27            17.    Thus, Wells Fargo's Discretionary Pricing Policy causes persons with

28    identical or similar credit scores to pay different amounts for the cost of credit.  By using a

- 4 -

1    subjective pricing component that is designed to charge persons with the same credit profiles

2    different amounts of finance charges, the objective qualities of the initial credit analysis used to

3    calculate the Par Rate is undermined and the potential for race bias in the transaction is

4    introduced.

5    **The Discretionary Pricing Policy Disparately Impacts African American Homeowners.**

6            18.     Wells Fargo's Discretionary Pricing Policy disparately impacts African

7    American purchasers.  While the Discretionary Pricing Policy is facially neutral in that Wells

8    Fargo uses the same or effectively the same policy for all credit applicants, it has a

9    disproportionately adverse effect on African Americans compared to similarly situated

10   Caucasians because African Americans are more likely to pay higher discretionary charges and

11   with greater frequency than similarly situated Caucasians.

12           19.     Statistical analyses of discretionary charges imposed on African American

13   and Caucasian customers reveal that African Americans, after controlling for credit risk, are

14   substantially more likely than similarly situated Caucasians to pay such charges.

15           20.     The disparities between the terms and cost of Wells Fargo's home

16   mortgage loans offered to African Americans homeowners and those offered to Caucasian

17   homeowners cannot be a product of chance and cannot be explained by factors unrelated to race.

18   Instead, these disparities are the direct causal result of the use of the Discretionary Pricing Policy.

19           21.     There are no legitimate business reasons to justify Wells Fargo's

20   discriminatory Discretionary Pricing Policy that could not be achieved by a policy that has no

21   discriminatory impact or a greatly reduced discriminatory impact.

22           22.     Wells Fargo has a non-delegable duty to ensure that its mortgage financing

23   structure and policies do not have a disparate impact on legally-protected classes, such as African

24   Americans.  Despite its non-delegable duty, Wells Fargo has chosen to use a commission-driven,

25   subjective pricing policy that it knew, or should have known, would have a significant and

26   pervasive adverse impact on African American homeowners.  Indeed, the lending industry has

27   long known that discretionary pricing policies result in African Americans receiving rates and

28   terms that are drastically worse than those given to similarly situated Caucasians.

- 5 -

23.    While oft suspected, this discrimination has only recently been disclosed to the public and quantified, however.  Only in the last few years have mortgage lenders, including Wells Fargo, been required to submit details of their sub-prime home loans under the Home Mortgage Disclosure Act ("HMDA").

24.    The latest HMDA data from the Department of Housing and Urban Development ("HUD") indicate that African Americans who borrow from Wells Fargo are as much as five times more likely than Caucasians to receive a high APR loan to purchase a home and also more likely to receive a high APR when refinancing.  A high APR loan is one that carries an APR at least three percentage points higher than the interest rate on U.S. Treasury securities of the same maturity.

25.    The Federal Reserve Board specifically concluded from the HMDA data that African Americans are more likely to pay higher prices for mortgages than Caucasians.  See http://federalreserve.gov/boarddocs/testimony/2006/20060613/default.htm.  The United States Inspector General also noted "significant" differences, making it "clear" that African Americans were "much more likely to get higher-priced loans" than Caucasians.

26.    The Center for Responsible Lending performed a comprehensive study using this data and a custom software program to analyze over 177,000 individual loans, culminating in a May 31, 2006 report entitled "Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages." http://www.responsiblelending.org/issues/mortgage/reports/page.jsp?itemID=29371010..  Loan data from Wells Fargo was analyzed as part of the study.  The study combined self-reporting data directly from the lenders with a proprietary loan-level database that was able to account for specific risk profiles.  Even after accounting for risks, "large and statistically significant" disparities remained:

　　　• On fixed-rate loans, African Americans are 31% to 34% more likely to receive a higher-rate loan than if they had been Caucasian.  Those numbers were even higher for loans containing prepayment penalties, which accounted for over 60% of the loans issued to African American mortgagees.

1    • On adjustable-rate loans, African Americans are up to 15% more likely to receive a

2      higher-rate loan than if they had been Caucasian.

3  These disparities can only be explained by race.

4        27.    In another study, the National Community Reinvestment Coalition

5  determined that lending institutions in six major metropolitan areas engaged in "pervasive

6  discriminatory and predatory practices," including making high cost sub-prime loans to higher-

7  qualified African Americans 54% of the time, compared to 23% of the time for Caucasians, even

8  when Caucasian applicants were similarly, and often less, qualified.  See

9  http://www.ncrc.org/policy/analysis/policy/2007/Committee_Hearing_April_17.pdf.

10        28.    According to Harvard's Joint Center for Housing Studies, African

11  Americans are more than five times as likely as Caucasians to be put into an equity-draining

12  "sub-prime" loan – a higher-cost mortgage product that is theoretically given to borrowers who

13  have impaired credit – than their Caucasian counterparts.  See http://www.jchs.harvard.edu/

14  publications/finance/w05-11.pdf.  This is so, in part, because the sub-prime industry has

15  attempted to maximize its profits by directing borrowers with relatively good credit to sub-prime

16  mortgages.  These predatory tactics have been disproportionately applied against members of the

17  African American community.

18        29.    Indeed, according to Federal Reserve data, the majority of African

19  Americans who took out mortgages in 2005 were put into higher-cost sub-prime loans, compared

20  with about 17% of Caucasians.  See http://www.federalreserve.gov/pubs/bulletin/

21  2006/hmda/bull06hmda.pdf.

22        30.    While some borrowers in the sub-prime market are genuine credit risks,

23  many African American borrowers have been targeted and illegally steered into sub-prime loans.

24  Wells Fargo is reluctant or refuses to offer these borrowers the prime loans that are offered to

25  Caucasian borrowers with the same qualifications.  Instead, Wells Fargo engages in predatory

26  sub-prime lending and knowingly makes loans with high loan-to-value ratios to borrowers who

27  qualify for lower-cost or prime loans.  This effectively dilutes the equity from the property, places

28  the borrower in jeopardy of default, and puts the borrower in the position of spending years

- 7 -

1  paying off additional loan balances without developing any equity.  A significant percentage of

2  borrowers who received sub-prime mortgages could have qualified for traditional mortgages at

3  the lower rates offered by banks to prime borrowers.

4          31.    Earlier this year, over 80 consumer groups wrote to Federal Banking

5  Agencies about a particular type of sub-prime loan, the sub-prime 2-28 and 3-27 adjustable rate

6  mortgage ("ARM").  See http://www.consumersunion.org/pdf/Non-trad-guidance207.pdf.  These

7  ARM loans contain an average built-in "shock payment" increase of 29%, even if interest rates

8  remain unchanged.  Fitch Ratings reports that the actual payment shock may be as high as 48%.

9  The majority of sub-prime loans made to African Americans had these 2-28 or 3-27 ARMs.  The

10  Center for Responsible Lending estimates that 2.2 million such sub-prime loans have ended or

11  will end in foreclosure, a rate of 19%.  See http://www.responsiblelending.org/issues/mortgage/

12  reports/page.jsp?itemID=31214551.

13          32.    HUD found that in neighborhoods where at least 80 percent of the

14  population is African American, borrowers were 2.2 times as likely as borrowers in the nation as

15  a whole to refinance with a sub-prime lender.  See http://www.responsiblelending.org/index.html.

16  In fact, upper-income African American borrowers are twice as likely as lower-income Caucasian

17  borrowers to have sub-prime loans.  See http://www.huduser.org/publications/pdf/brd/

18  13Fishbein.pdf.  Accordingly, the Secretary of HUD, Alphonso Jackson, was recently quoted as

19  stating he believes African Americans have been specifically targeted by sub-prime lenders.  See

20  http://www.nedap.org/pressroom/documents/2007-June-13_Bloombergv2.pdf.

21          33.    In addition to carrying higher interest rates and charges, Wells Fargo's sub-

22  prime loans to African Americans are typically laden with insufficiently disclosed fees and

23  excessive prepayment penalties which effectively prohibit borrowers from refinancing at a fairer

24  rate.  The Center for Responsible Lending estimates that families lose $2.3 billion each year from

25  their home equity wealth because of prepayment penalties in sub-prime mortgage loans.  See

26  http://www.responsiblelending.org/pdfs/ib008-PPP_in_Subprime_Loans-0604.pdf.

27          34.    Even after African American applicants manage to secure financing for

28  their homes, they are often subjected to other abusive practices by their lenders, including the

- 8 -

failure to provide timely and complete adverse action notices, in violation of 15 U.S.C. § 1691(d). The culmination of all of these discriminatory practices results in foreclosures for African American homeowners more frequently than for similarly situated Caucasians.

35.    These statistical disparities are not mere happenstance, but instead result from a systematic and predatory targeting of African Americans.  African American and Caucasian borrowers with the same qualifications should be treated equally.  Instead, Wells Fargo has discriminated against the African American homeowners through several discriminatory practices, including their Discretionary Pricing Policy.

### Plaintiff Ruby Kathryn Brown

36.    Plaintiff Ruby Kathryn Brown is an African American homeowner who financed her home with a 2-28 ARM loan purchased from Wells Fargo during the relevant time period.  The loan had a disclosed APR of 8.7160 % and included $5,141.08 in settlement charges.

37.    Unbeknownst to Ms. Brown, the contract APR on the mortgage loans was a combination of an objective, risk-based calculation and a totally subjective, discretionary component added pursuant to Wells Fargo's Discretionary Pricing Policy.

38.    On information and belief, Ms. Brown was subject to Wells Fargo's Discretionary Pricing Policy and, as a result, received a higher interest rate and/or a disproportionately greater amount in non-risk-related credit charges than similarly situated Caucasians.

### CLASS ACTION ALLEGATIONS

39.    Plaintiff sues on her own behalf and on behalf of a class of persons under Rules 23(a) and (b)(2)-(3) of the Federal Rules of Civil Procedure.  This action satisfies the ascertainability, numerosity, commonality, typicality, adequacy, predominance and superiority requirements of those provisions.

### The Class:

All Black or African American consumers who obtained a Wells Fargo home mortgage loan in the United States between January 1, 2001 and the date of judgment in this action (the "Class Period") and who were subject to Wells Fargo's Discretionary Pricing

- 9 -

Policy pursuant to which they paid discretionary points, fees or interest mark-ups in connection with their loan.

40.      Excluded from the Class are (1) Wells Fargo, any entity or division in which Wells Fargo have a controlling interest, and its/their legal representatives, officers, directors, assigns and successors; (2) the judge to whom this case is assigned and any member of the judge's immediate family; and (3) claims for personal injury, wrongful death and emotional distress and claims of consequential property damage and loss.

41.      The phrase "Black or African American" refers to the definition used in the 2000 United States Census.

42.      The phrase "Discretionary Pricing Policy" refers to Wells Fargo's policy of authorizing its network of mortgage brokers to impose subjective, discretionary charges and interest mark-ups as a part of the finance charges on the loans they originate.

43.      Numerosity: Plaintiff does not know the exact size or identities of the proposed Class, since such information is in the exclusive control of Wells Fargo.  Plaintiff, however, believes that the Class encompasses many hundreds or thousands of individuals who are geographically dispersed throughout the United States. Therefore, the Class is so numerous that joinder of all members is impracticable.

44.      Ascertainability: The Class is composed of an easily ascertainable, self-identifying set of Black and African American persons who obtained a Wells Fargo home mortgage loan.  Moreover, Class members are easily identifiable from records maintained by, and in the possession and control of, Wells Fargo.

45.      Commonality/Predominance: All members of the Class have been subject to and affected by the same Discretionary Pricing Policy.  There are questions of law and fact that are common to the Class, and predominate over any questions affecting only individual members of the Class.  These questions include, but are not limited to:

a.      the nature, scope and operations of Wells Fargo's Discretionary Pricing Policy;

1    b.    whether Wells Fargo is a creditor under ECOA because, for example, in the

2  ordinary course of its business it participates in the decision of whether or not to extend credit to

3  consumers;

4    c.    whether Wells Fargo's Discretionary Pricing Policy is a facially-neutral credit

5  pricing system that resulted in racial discrimination in violation of the ECOA and the FHA;

6    d.    whether there are statistically-significant disparities between the amount of the

7  discretionary charges imposed on African American homeowners and the amount of the

8  discretionary charges imposed on Caucasian persons that are unrelated to creditworthiness;

9    e.    whether any legitimate business reason for the Discretionary Pricing Policy can be

10  achieved by a credit pricing system less discriminatory in its impact;

11    f.    whether the Court can enter declaratory and injunctive relief; and

12    g.    the proper measure of disgorgement or damages.

13    46.    Typicality: The claims of the named Plaintiff are typical of the claims of

14  the Class and do not conflict with the interests of any other members of the Class in that both the

15  Plaintiff and the other members of the Class were subjected to the same Discretionary Pricing

16  Policy that has disproportionately affected African American homeowners.

17    47.    Adequacy: The named Plaintiff will fairly and adequately represent the

18  interests of the Class.  Plaintiff is committed to the vigorous prosecution of the Class's claims and

19  has retained attorneys who are qualified to pursue this litigation and have experience in class

20  actions – in particular, consumer protection and discrimination actions, including actions against

21  automobile financing companies for similar discriminatory subjective mark-up practices.  Neither

22  Plaintiff nor her counsel has any interest adverse to those of Class members.

23    48.    Superiority:  A class action is superior to other methods for the fast and

24  efficient adjudication of this controversy.  A class action regarding the issues in this case does not

25  create any problems of manageability.

26    49.    In the alternative, Wells Fargo has acted or refused to act on grounds

27  generally applicable to the case, thereby making appropriate final injunctive relief or

28  corresponding declaratory relief with respect to the Class as a whole.

- 11 -

## TOLLING OF THE STATUTE OF LIMITATIONS

50.     The causes of action alleged herein accrued upon discovery of the discriminatory impact of Wells Fargo's Discretionary Pricing Policy.   Plaintiff and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence the factual bases of those claims.  Indeed, the data forming the basis of Plaintiff's claims was only recently released and analyzed in a comprehensive manner.  Moreover, because Wells Fargo knowingly and actively concealed the facts alleged herein, Plaintiff and the Class have been kept ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part.

51.     Commission-driven, discretionary pricing systems, such as those used in the mortgage industry and structurally similar to the system utilized by Wells Fargo, have been found to produce significant discriminatory effects.  Knowledge concerning the significant and pervasive discriminatory impact of such commission-driven, discretionary credit pricing systems has been widely circulated within the financing industry for several years, as a result of numerous actions by the United States Department of Justice and federal regulatory agencies.  Thus, Wells Fargo knew or should have known that its credit pricing system causes African American homeowners to pay more for mortgage financing than the amounts paid by Caucasian customers with identical or effectively-identical credit scores.

52.     Despite the fact that Wells Fargo knew or should have known of the discriminatory effect of its Discretionary Pricing Policy, none of the loan documents inform the customer that its finance rates are subjective and not based solely on risk-related characteristics.

53.     Wells Fargo was and is under a continuous duty to disclose to the Plaintiff and Class material information regarding their loans.  The fact that certain loan terms are subjective and discretionary is information a reasonable borrower would consider important when deciding whether to purchase the loan and on what terms.  The fact that that the subjective and discretionary components result in a disparate impact on African Americans is also information a reasonable African American borrower would consider important.

54.     Wells Fargo failed to disclose this information, however, and Plaintiff and Class Members reasonably relied upon Wells Fargo's representation that terms of their loans would be based on their creditworthiness.  Wells Fargo financing documents falsely foster the image that Wells Fargo offers competitive rates that are objectively set.  However, Wells Fargo never discloses to its credit applicants the fact that: (a) its credit rates are subjective and can vary significantly among persons with identical credit profiles; and (b) it has authorized and provided a financial incentive to mortgage brokers to subjectively increase the credit rate above the rate otherwise available to homeowners.

55.     Due to the inherent nature of the Wells Fargo's undisclosed Discretionary Pricing Policy and due to Wells Fargo's deception and concealment, Wells Fargo's African American customers have no way of knowing or suspecting: (a) the existence of Wells Fargo's subjective credit pricing policy; (b) that they were charged additional subjective credit charges; or (c) that they were charged a disproportionately greater amount for their cost of credit than similarly situated Caucasian persons.  Thus, Wells Fargo is estopped from relying on any statutes of limitation in its defense of this action.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
**Violation Of The Equal Credit Opportunity Act – 15 U.S.C. § 1691, *et seq.***

56.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

57.     Wells Fargo is a creditor as defined in the ECOA, and, in the ordinary course of its business, participated in the decision of whether or not to extend credit to Plaintiff and Class members.

58.     Wells Fargo maintains a policy of authorizing its agents and officers to add subjective and discretionary charges and interest mark-ups to the home mortgage loans it originates.  Wells Fargo designed, disseminated, controlled, implemented and profited from the discriminatory policy and practice alleged herein (the Discretionary Pricing Policy) which has had a disparate economic impact on African American homeowners compared to similarly situated Caucasians.

- 13 -

59.    All actions taken by Wells Fargo's employees and brokers were in accordance with the specific authority granted to them by Wells Fargo and were in furtherance of Wells Fargo's policies and practices.

60.    As a result of Wells Fargo's Discretionary Pricing Policy, Wells Fargo has collected more in finance charges from African American homeowners than from similarly situated Caucasian persons for reasons totally unrelated to credit risk.

61.    Wells Fargo's Discretionary Pricing Policy violates the ECOA and constitutes actionable discrimination on the basis of race.

62.    Plaintiff and Class members are aggrieved persons as defined in the ECOA by virtue of having been subject to Wells Fargo's discriminatory Discretionary Pricing Policy.

## SECOND CLAIM FOR RELIEF
### Violation Of The Fair Housing Act – 42 U.S.C. §3601, *et seq.*

63.    Plaintiff incorporates by reference the allegations contained in preceding paragraphs of this Complaint.

64.    Wells Fargo engaged in residential real estate-related transactions with respect to Plaintiff and Class members.

65.    Wells Fargo's Discretionary Pricing Policy has resulted in discrimination with respect to Plaintiff and Class members.

66.    As a result of Wells Fargo's Discretionary Pricing Policy, Wells Fargo has collected more in finance charges from African American homeowners than from similarly situated Caucasian persons for reasons totally unrelated to credit risk.

67.    Wells Fargo's Discretionary Pricing Policy violates the FHA and constitutes actionable discrimination on the basis of race.

68.    Plaintiff and the Class are aggrieved persons as defined in the FHA by virtue of having been subject to Wells Fargo's discriminatory Discretionary Pricing Policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the members of the Class,

- 14 -

demands judgment against Wells Fargo as follows:

1.    An order certifying the proposed Class and any appropriate subclasses and designating Plaintiff as Class representative and her counsel as Class counsel;

2.    A declaration that, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613, the acts and practices of Wells Fargo complained of herein are in violation of the ECOA and the FHA;

3.    A permanent or final injunction, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), enjoining Wells Fargo, and Wells Fargo's agents and employees, affiliates and subsidiaries, from continuing to discriminate against Plaintiff and the members of the Class because of their race through further use of the Discretionary Pricing Policy or any non-risk related discretionary pricing policy employed by Wells Fargo and retain jurisdiction to ensure and, where necessary, enforce compliance with the injunction;

4.    An order directing Wells Fargo, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), to adopt and enforce a policy that requires appropriate training of the Wells Fargo's employees and its network of mortgage brokers to prevent discrimination;

5.    An order directing Wells Fargo, pursuant to 15 U.S.C. § 1691e(c) and/or 42 U.S.C. § 3613(c), to monitor and/or audit the racial pattern of its financings to ensure the cessation of discriminatory effects in its home mortgage transactions;

6.    A declaration, pursuant to 15 U.S.C. § 1691e(c), that Wells Fargo must disgorge, for the benefit of the Class, all or part of its ill-gotten profits it received from imposing disproportionate non-risk charges on African American homeowners pursuant to Wells Fargo's Discretionary Pricing Policy; and an order directing the equitable distribution of such charges, as restitutionary relief, to all appropriate Class members;

7.    Actual and punitive damages to the Plaintiff and Class members pursuant to 42 U.S.C. § 3613(c);

8.    Attorneys' fees and costs, including but not limited to cost of experts, pursuant to 15 U.S.C. § 1691e(d) and/or 42 U.S.C. § 3613(c); and

- 15 -

9.    Other and further relief as this Court finds necessary and proper.

### DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the proposed Class, demands a jury trial in this action for all of the claims so triable.

Dated: January 23, 2008

Jennie Lee Anderson

Lori E. Andrus
Micha Star Liberty
Jennie Lee Anderson
ANDRUS LIBERTY & ANDERSON LLP
1438 Market Street
San Francisco, CA 94102
Telephone: (415) 896-1000
Facsimile: (415) 896-2249
lori@libertylawoffice.com
micha@libertylawoffice.com
jennie@libertylawoffice.com

Barry W. Walker
THE WALKER LAW FIRM
Two 20th Street North, Suite 1320
Birmingham, Alabama 35203
Telephone: (205) 252-2770
Facsimile: (205) 252-2119
barry@bwwlawllc.com

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT