COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-5434 (fax)
shawnw@csgrr.com
        -and-
SAMUEL H. RUDMAN (*Pro Hac Vice*)
ROBERT M. ROTHMAN (*Pro Hac Vice*)
MARK S. REICH (*Pro Hac Vice*)
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@csgrr.com
rrothman@csgrr.com
mreich@csgrr.com

*Liaison Interim Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re WELLS FARGO RESIDENTIAL MORTGAGE LENDING DISCRIMINATION LITIGATION<br><br>This Document Relates To:<br><br>    ALL ACTIONS. | Lead Case No. C-07-3880 MJJ<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT WELLS FARGO, N.A.'S MOTION TO STAY ALL PROCEEDINGS PENDING A DECISION ON TRANSFER BY THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**<br><br>Hearing Date:   March 4, 2008<br>Time:           9:30 a.m.<br>Courtroom:      11, 19th Floor<br><br>***Honorable Martin J. Jenkins*** |

## I. INTRODUCTION

Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo") moves to stay the *Jeffries* and *Ventura* actions (the "Consolidated Actions") because it has filed a Motion for coordination of related proceedings before the Judicial Panel on Multidistrict Litigation ("JPML" or the "Panel"). Defendant's Motion must be denied, and the Consolidated Actions should proceed pursuant to the schedule set forth in the Court's January 8, 2008 Scheduling Order (the "Scheduling Order").

The JPML's Rules explicitly state that a motion to transfer does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending. *See* JPML Rule 1.5. Here, the imposition of a stay will not conserve judicial resources or avoid duplicative litigation and discovery. Instead, it will circumvent the steady progress of the basic initial discovery already underway and impose a prejudice upon Plaintiffs to achieve prompt relief for themselves and the putative Class.

Moreover, proceeding with initial discovery is hardly unfair to, or a hardship upon, Wells Fargo. The recent Scheduling Order was entered upon the joint submission of all parties. Wells Fargo met with the Court and, with no mention that it would seek a stay, specifically agreed to this schedule knowing of similar cases filed in other districts. In addition, at the time the Scheduling Order was entered, the Court was fully aware of Defendant's pending petition before the Panel, and fully considered whether that petition should impede the progress of these Consolidated Actions.

In sum, there simply is no good reason to divert from JPML Rule 1.5 and impose a stay of the Consolidated Actions.

## II. RELEVANT FACTS

This Court held an initial case management conference on December 18, 2007, and thereafter, on January 8, 2008, entered Pretrial Order No. 1 ("PTO1"). Among other things, PTO1 consolidated the *Jeffries* and *Ventura* actions pursuant to Federal Rule of Civil Procedure 42. By entering PTO1 in these Consolidated Actions, the Court disregarded Defendant's Qualified Objection, filed on January 4, 2008, which asserted that consolidation was inappropriate given the fact that it had filed its Motion before the JPML for multidistrict transfer of related actions. On

1  January 8, 2008, this Court also issued the Scheduling Order, which was the end result of
2  considerable discussion with counsel for all parties at the initial case management conference, and
3  detailed the schedule for all phases of these Consolidated Actions, including fact discovery.

4  Defendant's Motion before the JPML asks that these Consolidated Actions be coordinated in
5  one district with three later-filed actions, namely, *Rodriguez v. Wells Fargo Bank*, N.A., No. 07-cv-
6  6780, C.D. Cal. (filed October 18, 2007); *Williams v. Wells Fargo Bank, N.A*., No. 07-cv-6342, N.D.
7  Ill. (filed November 8, 2007); and *Brown v. Wells Fargo Bank, N.A*., No. 08-cv-0492, N.D. Cal.
8  (filed January 23, 2008).  As it was filed in this Court, the *Brown* action will be automatically
9  governed by PTO1, and thus, the Scheduling Order will apply.

10  With the exception of Defendant and plaintiffs in the fourth-filed action, *Williams*, all parties
11  in the other related cases, including Plaintiffs in the Consolidated Actions, favor the Panel's transfer
12  of the coordinated proceedings to this Court, where the first-filed and most advanced cases are
13  pending, and in a judicial district where Defendant maintains its corporate headquarters.  Defendant
14  prefers the Southern District of Iowa, where no action is pending, or the Northern District of Illinois,
15  where the fourth-filed action is pending.  The matter is set for hearing on March 27, 2008.  The
16  Panel will likely not rule until late April, at the earliest, which is more than nine months after the
17  first of these Consolidated Actions was filed.

18  No stay has been entered or sought in any of the related tagalong actions.  In *Rodriguez,* the
19  parties are scheduled to submit Rule 26(f) Reports on March 17, 2008, and an initial scheduling
20  conference is set for March 24, 2008.  The *Williams* court has likewise yet to hold an initial case
21  management conference, having postponed the conference scheduled from January 16, 2008 to April
22  29, 2008.

23  In contrast, Plaintiffs in the Consolidated Actions have moved forward with their cases.  The
24  various counsel involved in both *Jeffries* and *Ventura* have diligently and efficiently organized
25  themselves.  Fact discovery has already commenced through Plaintiffs' service of initial document
26  requests and Rule 30(b)(6) deposition notices in January 2008.

27
28

**III.    ARGUMENT**

Both the Panel's Rules and on-point Northern District of California authority support denial of a stay. It is a fundamental tenet that a motion to transfer filed with the JPML does not impact the schedule already in place in actions that may be affected by a transfer. Rule 1.5 of the JPML, entitled "Effect of the Pendency of an Action Before the Panel," specifically reads:

> The pendency of a motion, order to show cause, conditional transfer order or conditional remand order before the Panel concerning transfer or remand of an action pursuant to 28 U.S.C. §1407 does not affect or suspend orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court.

Accordingly, a pending motion to transfer alone clearly does not warrant staying an action.

Defendant seeks a stay of these Consolidated Actions even after it participated extensively in the pretrial process that culminated in the submission of a joint Scheduling Order, which was entered as proposed. At the initial case management conference on December 18, 2007, the Court and the parties spent a considerable amount of time establishing the phases of this litigation and the corresponding deadlines. Wells Fargo agreed to the schedule without mentioning that it would seek a stay or file with the Panel, even though other similar cases were already pending. Moreover, the Court was fully aware of the multiple, related cases and the MDL petition at the time of the entry of the Scheduling Order and PTO1, and rejected Defendant's Qualified Objection to PTO1. Defendant advances no new reason why the Court should now reverse course.

While the JPML's Rules do not require, and in fact would discourage, the disruption of the Scheduling Order in these Consolidated Actions, this Court retains the inherent power to impose a stay pending a motion to transfer before the JPML. In doing so, this Court should examine the following three factors: (1) conserving judicial resources and avoiding duplicative litigation; (2) hardship and inequity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party. *Falk v. GMC*, No. C 07-01731 WHA, 2007 U.S. Dist. LEXIS 80864 (N.D. Cal. Oct. 22, 2007). None of these factors, however, weigh in favor of a stay.

**A.    Conserving Judicial Resources and Avoiding Duplicative Litigation**

Denying Defendant's Motion to stay would not result in the wasting of judicial resources. The current status of the Consolidated Actions does not require any immediate judicial intervention

and simply requires the parties to proceed with the fact discovery already served pursuant to the Court's Scheduling Order.

Defendant's contention that these Consolidated Actions should be stayed simply because the *Rodriguez*, *Williams* and *Brown* actions are related falls flat. Def. Mem. at 4-5[1]. Indeed, "[n]othing requires that an action be stayed when a motion to consolidate and transfer is pending." *Falk*, 2007 U.S. Dist. LEXIS 80864, at *5. Defendant cannot muster any more support for its position that "judicial economy mandates a stay," than to argue, "[i]t would be manifestly inefficient to allow *Jeffries* and *Ventura* to proceed, and to force Wells Fargo to respond to discovery and make initial disclosures of documents and witnesses, before the MDL Panel has ruled." Def. Mem. at 4-5.

Defendant simply has not identified any waste of judicial resources that would be caused by moving forward with discovery. Indeed, with Defendant's active participation, this Court already has expended time and resources to commence the discovery process, and there will very likely be no need for further judicial intervention or resources between now and the time of the expected ruling of the Panel after hearing of the matter on March 27, 2008.

As for avoiding duplicative litigation, any fact discovery that takes place in the Consolidated Actions can and will be utilized later in the likely event the JPML will coordinate the actions in one district. At this stage in the litigation, basic initial discovery can certainly continue in the Consolidated Actions without harm. Plaintiffs have served document requests and two Rule 30(b)(6) deposition notices. These deposition notices cover topics such as Wells Fargo's organizational structure and maintenance of its electronic data. This informational discovery will be usable in the forthcoming MDL proceedings – indeed, the initial document requests seek materials in an electronic format, which underscores the fact that this discovery can easily be shared and utilized in later proceedings.

---

[1] References to "Def. Mem." are to Defendant's Memorandum of Points and Authorities in Support of its Motion to Stay All Proceedings Pending a Decision on Transfer by the JPML, filed on January 24, 2008.

In fact, as the Northern District has previously recognized, in circumstances such as these, to allow the parties to continue the discovery process will only *expedite* the discovery process should the remaining actions be consolidated. *See Falk*, 2007 U.S. Dist. LEXIS 80864, at *7 (denying a stay because "[d]efendant would have to turn over the same documents, and plaintiff would have to depose the same witnesses whether or not these actions are consolidated and transferred"). Moreover, since the other relevant pending actions have yet to even hold initial case management conferences, and the Panel's ruling is expected to be forthcoming shortly after hearing of the matter on March 27, 2008, there is negligible risk of inconsistent discovery rulings or duplication.

Finally, Defendant's reliance on *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997), Def. Mem. at 5, is inapposite. In *Rivers*, the court expressed unease about having to needlessly take the time to familiarize itself with the intricacies of the case. Here, this Court is already familiar with the case and will not be asked to devote any significant time to the Consolidated Actions between now and the expected decision by the JPML after the March 27, 2008 hearing.

**B.     Hardship to Defendant**

It will not be a hardship on Defendant to conduct discovery that it just recently agreed to conduct pursuant to the Scheduling Order. No argument can be made against the absolute necessity and inevitability of the discovery efforts, which can be undertaken while the parties await a decision by the Panel. Exchanging disclosure statements, informational depositions and gathering relevant documents now will certainly not cause any duplicative effort on Wells Fargo's part in the future. This is basic discovery, which will be necessary and will be utilized by all with or without the MDL proceedings. *See Falk*, 2007 U.S. Dist. LEXIS 80864, at *8-*9 (finding "no reason to stop discovery" on the basis of hardship to defendant when the same discovery "will probably have to be [performed] at some point regardless of the outcome of the consolidated motion"). Moreover, Defendant has already answered the Complaint – thus, this situation is not one where Defendant faces the prospect of expenses brought on by forced participation in a discovery process that might prove unnecessary if its dispositive motion is granted from the outset.

1    Defendant's cases, *Am. Seafood, Inc. v. Magnolia Processing, Inc.*, No. 92-1030, 1992 U.S.
2  Dist. LEXIS 7374 (E.D. Pa. May 8, 1992) and *Gorea v. Gillette Co.*, No. 05 Civ. 2425, 2005 WL
3  2373440, at *1 (W.D. Tenn. Sept. 26, 2005), are unavailing. In *Am. Seafood*, there were six pending
4  motions dealing with "either substantive legal issues or the important procedural questions of class
5  action certification." *Am. Seafood*, 1992 U.S. Dist. LEXIS 7374, at *5. Here, however, not a single
6  motion is pending before this or any other trial court. So, unlike in *Am. Seafood*, where the court
7  was concerned about "judicial economy and possible prejudice to the defendants," that issue is not
8  present in this case. Moreover, in *Gorea*, plaintiff did not even oppose a stay of discovery, but asked
9  that the court rule on the issue of class certification before imposing a stay. *Gorea*, 2005 WL
10 2373440, at *1. *Gorea*, therefore, has no bearing on the facts at issue here.

11   In short, denial of the Motion will result in no hardship or inequity to Defendant.

12   **C.    Prejudice to Plaintiffs**

13   The Consolidated Actions have been pending for more than 6 months and further delay will
14 prejudice Plaintiffs. To grant Defendant's Motion for a stay would unquestionably serve to delay
15 any possible relief to Plaintiffs and the putative Class and potentially cause many Class members
16 further harm. Many of the putative Class may soon be unfortunate victims of the current foreclosure
17 crisis. *See e.g.* Carolyn Said, <u>Startling Jump in California Foreclosures</u>, S.F. Chron., Jan. 23, 2008
18 (foreclosures increasing at startling rate; attached hereto as Exhibit A). More and more homeowners
19 face foreclosure with every day that passes. An unnecessary disruption and delay in prosecuting
20 these cases will undoubtedly serve as a prejudicial detriment to the ability of these borrowers to
21 avoid the devastating effects brought on by Defendant's alleged misdeeds.

22   Further, Defendant's unsupported, blanket assertion that "[p]laintiffs have expended limited
23 resources to date," Def. Mem. at 6, is simply untrue. In fact, Plaintiffs' time and resources, as well
24 as the Court's, were expended as Defendant did not file its MDL motion to transfer until well after
25 the initial case management conference in these Consolidated Actions. Defendant waited, all the
26 while agreeing to the proposal, which ultimately became the Scheduling Order herein. It is certainly
27 unfair for Defendant to now maintain that Plaintiffs would suffer no prejudice by a stay.

28

## IV. CONCLUSION

A stay of the Consolidated Actions will accomplish nothing but unnecessary and prejudicial delay. Accordingly, Plaintiffs respectfully request that this Court deny Defendant's Motion to stay the Consolidated Actions.

DATED: February 19, 2008

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP


_/s/ Robert M. Rothman_
ROBERT M. ROTHMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

SHAWN A. WILLIAMS
100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

*Liaison Interim Class Counsel*

RODDY KLEIN & RYAN
GARY KLEIN
727 Atlantic Avenue
Boston, MA 02111-2810
Telephone: 617/357-5500
617/357-5030 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
 & BALINT, P.C.
ANDREW S. FRIEDMAN
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: 602/274-1100
602/274-1199 (fax)

*Co-Lead Interim Class Counsel*

# EXHIBIT A

SFGate.com

## Startling jump in California foreclosures
Carolyn Said, Chronicle Staff Writer
Wednesday, January 23, 2008

 

**(01-22) 11:22 PST SAN FRANCISCO** -- The housing market's vicious downward cycle wreaked more havoc in 2007, as record numbers of people in California and the Bay Area lost their homes to foreclosure, according to a report released Tuesday.

Coming on the heels of statistics showing home sales at record lows and prices slumping, the foreclosure information was a fresh reminder that the real estate malaise directly hurts many homeowners, particularly those with risky subprime mortgages. California, where home prices saw double-digit appreciation during the post-millennium real estate frenzy, is now seeing equally dramatic increases in foreclosures. The nation's foreclosure crisis has spread to the point where many analysts say the country is either in recession or on the brink. The Federal Reserve's major interest-rate cut on Tuesday underscored how seriously the government views the situation.

Lenders repossessed 84,375 California houses and condos in 2007, up more than sixfold from 12,672 in 2006, according to DataQuick Information Systems, a La Jolla (San Diego County) research firm.

In the fourth quarter, 31,676 residences in California were foreclosed upon. That was a 421.2 percent increase from 6,078 in the year-ago quarter.

In the Bay Area, a total of 11,530 homes were lost to foreclosure in 2007, almost seven times the 1,651 foreclosures in 2006. Contra Costa had the most foreclosures, with 4,003 residences repossessed - or 13.2 out of every 1,000 homes and condos. Smaller Solano County had a higher rate per residences, with 1,753 homes repossessed, representing 14.2 out of every 1,000 homes and condos.

For the fourth quarter, Bay Area foreclosures rose 482.5 percent to 4,573, compared with 785 in the year-ago quarter. Again, Contra Costa County, with 1,558 foreclosures, up 533.3 percent from a year ago, had the most homes repossessed, followed by Alameda County with 1,026 (a 514.4 percent increase) and Solano County with 704 (up 528.6 percent).

"It's getting worse," said Andrew LePage, an analyst with DataQuick. "Depreciation continues and makes it harder for more and more people when they fall behind in their payments to either sell or refinance their way out of trouble."

A separate DataQuick report released last week showed that home sales in December were down 43.2 percent in the Bay Area, while the median price fell $32,000, or almost 5 percent.

The rising tide of foreclosures is certain to exacerbate the market situation, experts said. After a lender forecloses on a home, it puts it up for sale, often at a discount.

"More and more of these homes are getting dumped on the market," said Christopher Thornberg, principal with Beacon Economics, a consulting firm. "That puts more downward pressure on the market; that leads to even more people getting foreclosed on, and so on and so forth."

The numbers of foreclosures are huge compared with current real estate sales. For example, in Contra Costa County, the 1,558 foreclosures in the fourth quarter are almost equal to the 1,589 homes that were sold in the same time period.

California had the most foreclosures since DataQuick began tracking them in 1988 and more than double the previous peak of 15,418 foreclosures in the third quarter of 1996.

The foreclosure crisis is a hot-button political issue as its fallout includes multibillion-dollar losses on Wall Street; widespread job loss in industries such as finance, construction and real estate; and the continuing downward housing spiral. Politicians and regulators have been scrambling to find solutions, such as loan modifications, in which lenders agree to temporarily or permanently freeze interest rates at lower levels for struggling homeowners.

But many individual cases show how intractable the problem can be.

---

Edward Payne, 70, and his wife Waveline, 71, have owned their four-bedroom San Pablo house since 1965. The tidy home has several cabinets crammed with the china and crystal bells that Waveline collects. Flowered sheets cover the sofas. The Paynes are raising their grandchildren, ages 12, 13 and 16, because their daughter, the children's mother, "took off," Edward Payne said.

After multiple refinances, their monthly payments are now $3,800 - even though their household income is just $4,000 a month from Social Security and a pension.

Through the years, the couple used their home equity to supplement Payne's salary as a shipping clerk and "pickler" at a galvanizing plant in Berkeley. As they raised three daughters, when they needed money for home repairs, family emergencies or items such as a new car, they refinanced the home and took out cash.

In April 2006, they refinanced again, bringing their total debt on the house to $505,000. Payne said he thinks he was overly trusting of the family friend who arranged the refinance and now won't return calls.

The refinance paid off credit cards and gave the Paynes cash for a new roof, fresh paint and other needed repairs. They tapped into that cash to help pay the new mortgage of $3,800 a month. But eventually it ran out, and they have not made a mortgage payment in three months. The mortgage is scheduled to reset $738 higher in April.

Meanwhile, since home values have slumped, the house is now worth about $465,000, they say.

Payne said he thought he would be able to refinance his way out of trouble, as he has done before.

"I didn't realize the housing market would fall," he said. "It's hard to sleep at night," he said. "I just lay there, just thinking about it. If it wasn't for the grandkids, it wouldn't be so bad. We could find a place for just Waveline and me."

DataQuick's LePage said it's unknown how many of the foreclosures are in situations like the Paynes', in which longtime homeowners drove up their debt through cash-out refinancing. "People who heavily tapped their equity are now finding that they're underwater; they owe more than they can get for their homes," he said.

---

In addition to skyrocketing foreclosures, mortgage default notices - sent by lenders when homeowners are several months behind on payments - also hit record highs. Default notices are the first step of the foreclosure process.

Statewide, 254,824 default notices were filed in 2007, up from 104,977 in 2006. In the fourth quarter, Californians received 81,550 default notices, up 114.6 percent from 37,994 in the fourth quarter of 2006. It was the most defaults since DataQuick began tracking them in 1992.

In the Bay Area, 37,557 notices of default were filed in 2007, up from 14,654 in 2006. Default notices in the fourth quarter were up 136.9 percent from the year-ago quarter, with 12,704 households receiving them. Year-to-year increases in default notices ranged from 84.4 percent in San Mateo County to 199.7 percent in Sonoma County. Contra Costa had the most notices by number, with 3,805, followed by Alameda with 2,573 and Santa Clara with 2,162.

Another gloomy statistic showed that default notices are increasingly more likely to turn into foreclosures. Homeowners can resolve defaults by catching up on their payments, refinancing or selling the house for what they owe. Only 41 percent of homeowners in default were able to pursue these solutions, DataQuick said, compared with 71 percent a year ago.

DataQuick said most of the loans that went into default in the quarter were originated between August 2005 and August 2006, during the height of the subprime loan frenzy.

G.U. Krueger, chief economist at IHP Capital Partners, an Irvine venture capital fund investing in

residential real estate, said he thinks that statistic holds out some hope for an end to the foreclosure escalation.

"The increases in foreclosures might be limited to certain vintage of years that were affected by really sketchy and funky financing, such as part of 2004, and 2005 and 2006," he said. "That eventually will have to taper off."

On a loan-by-loan basis, mortgages were most likely to go into default in Merced, San Joaquin and Stanislaus counties, DataQuick said. They were least likely to go into default in San Francisco, Marin and San Mateo counties.

*E-mail Carolyn Said at csaid@sfchronicle.com.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2008/01/23/MNTEUJN7I.DTL

This article appeared on page **A - 1** of the San Francisco Chronicle